STATE of Missouri, Plaintiff–Respondent,

v.

Fred HENDERSON, Defendant–Appellant.

No. 52112.

Missouri Court of Appeals, Eastern District, Division Two.

April 5, 1988.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 6, 1988.

Application to Transfer Denied June 14, 1988.

**556**

Henry B. Robertson, Asst. Public Defender, St. Louis, for defendant-appellant.

William L. Webster, Atty. Gen., L. Timothy Wilson, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

PUDLOWSKI, Judge.

The defendant, Fred Henderson, was convicted by a jury in the Circuit Court of the City of St. Louis of first degree murder. The trial court sentenced him, as a prior offender, to life imprisonment without parole. He appeals his conviction and we affirm.

On October 4, 1984 the defendant and Kenneth Whiteside went to the home of Renea Henderson, defendant's sister-in-law. They asked her for money to call a taxicab and defendant picked up his sawed-off shotgun and some shells. The two went to a pay phone, called a cab to Renea Henderson's address, then returned to Renea's house and waited for the cab to arrive. While waiting defendant told Whiteside that he was going to rob the cab driver, make him disrobe and then shoot him. Whiteside agreed to pretend to be blind by walking with a stick.

The cab arrived and defendant sat in the front seat and Whiteside sat in the rear. Defendant pulled the gun out of a pillowcase, told the driver to slide over and Whiteside drove the car to a viaduct on Kingshighway. Defendant instructed the driver to disrobe down to his underwear and to "start walking". The driver pleaded for his life and defendant fired three shots,

the last of which struck the driver in the heart and killed him. Defendant and Whiteside used the fourteen dollars they took from the driver to buy marijuana and liquor.

On the same day two men noticed an unoccupied taxicab in an alley and notified the police. The police, with the assistance of the cab company, determined that the last call the cab had made was to 2733 Rutger, the home of Renea Henderson. A day later the body of the driver, James Alfred, was found near a Kingshighway viaduct.

The police went to the home of Renea Henderson who told them that the defendant and Whiteside had summoned the cab and that defendant could be found at his grandmother's home. When the police arrived there they were admitted into the house by the grandmother. The defendant was found hiding under a pile of clothes in a bedroom closet.

■ In his first point defendant argues that the trial court erred in overruling his objection to the state's voir dire regarding the law of accomplice liability. In particular, he argues that while in the course of questioning to determine the veniremen's ability to follow the law, the prosecutor instructed the jury on the law of accomplice liability and thereby sought a commitment from the jury. Defendant also argues that upon instructing the jury on accomplice liability, which in itself was improper, the prosecutor compounded her error by instructing them on the felony murder rule rather than first degree murder.

The prosecutor informed the jury that defendant was charged with acting with another. The court allowed her to briefly comment as to the facts of the case to familiarize the panelists with the circumstances and to briefly explain the concept of acting with another. It is clear from the record that the prosecutor was trying to determine whether any of the panelists had any personal qualms about holding a person responsible for the crimes of another. Two panelists responded to this line of questioning in the affirmative and the court allowed the prosecutor to explore the juror's thoughts to determine whether they could follow the law regardless of their personal feelings.

The trial judge is in the best position to determine how the jury is affected by a particular line of questioning and has considerable discretion in the process. The appellate court will not interfere unless the record shows manifest abuse of discretion and real probability of injury to the complaining party. *State v. Cooper*, 719 S.W. 2d 20, 22 (Mo.App.1986). A juror may not be asked what verdict he would render if certain facts were shown. *State v. Green*, 511 S.W.2d 867, 872 (Mo.1974). The jurors in this case were not asked to so commit themselves, but rather, they were asked if personal feelings would prevent them from following the instructions of the court regarding accomplice liability. We find no abuse of discretion.

■ During this same line of questioning, the following exchange took place:

MS. BERKBIGLER: But, if you know this much: That two people have agreed to commit a crime, okay? And in the course of that crime someone gets killed, can you hold both of them responsible?

MS. SCHOELLHORN: I believe so.

MR. CHILDRESS: Your Honor, I'm going to object to that last question. She was describing with that last question the concept of murder in the second degree, as opposed to what he's (sic) charged here, which is murder in the first degree.

THE COURT: I suggest that the prosecutor form her question the same way that she formed it to Mr. Crittenden; and I think that will clear it up.

MS. BERKBIGLER: Again, if I can ask you. If two people act together for the purpose of committing a crime, can you hold them both responsible, regardless of which one actually did that act or which one actually did that act, if they have a common purpose?

MS. SCHOELLHORN: If that's what the law says, yes.

Defendant argues that the above statements by the prosecutor had the effect of

instructing the jury on law inapplicable to the case. However, it is clear from the record that after the defendant objected, the court guided the prosecutor back to a discussion of accomplice liability. We find no abuse of discretion.

In defendant's second point he argues that the trial court erred in failing to quash the jury panel after the prosecution used four of its peremptory challenges to remove all but one black veniremen from the jury panel. He argues that the record showed a racially discriminatory pattern in the exercise of the peremptory challenges which the state was unable to rebut.

In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Court held that a defendant establishes a prima facie case of purposeful discrimination in the selection of the petit jury when he shows: (1) that he is a member of a cognizable racial group; (2) that the prosecutor has exercised peremptory challenges to remove members of defendant's race from the jury panel; and (3) that these facts and any other relevant circumstances raise an inference that the prosecutor used peremptory challenges to exclude the veniremen from the jury on account of their race. In addition, the defendant is entitled to rely on the fact that peremptory challenges constitute a jury selection practice that permits those who are inclined to discriminate to do so. *State v. Hood*, 745 S.W.2d 785, 786 (Mo.App.1988). In deciding whether the defendant has made a prima facie showing, the reviewing court is required to give substantial deference to the decision of the trial judge. *Batson*, 106 S.Ct. at 1723. Once the defendant has made a prima facie showing of racial discrimination the burden shifts to the state to articulate a neutral and reasonably specific explanation of its legitimate reason for exercising the challenge. *Id.* at 1723, 1724 n. 20.

The recent decision in *State v. Antwine*, 743 S.W.2d 51, 64 (Mo. banc. 1987) has provided guidance in the interpretation and implementation of the principles enunciated in Batson.

As a practical matter, the third element of the prima facie case under Batson—

'facts and any other relevant circumstances raise an inference that the prosecutor used [his peremptory challenges] to exclude the veniremen from the petit jury on account of their race'—requires the trial court to consider the State's explanation of the manner in which it employed its challenges prior to making a final determination as to whether a prima facie case exists.

■ Recognizing the deference due the trial court in determining whether an articulated reason is legitimate or not, we review the determination of the trial court for clear error. *Id.* at 66. Here the trial court made insufficient findings with regard to the Batson issue. The court, upon defendant's motion to quash the jury panel, stated that obvious non-racial reasons existed for striking three out of four blacks from the panel. This finding is insufficient and as a result we must review the entire record of voir dire to determine whether the action of the trial court was clearly erroneous.

It is undisputed that the defendant is a black man and that the prosecutor used four of six peremptory challenges to strike black jurors from the venire. The remaining black person was struck by the defendant. The resulting petit jury consisted of twelve whites, a white and a black alternate. The prosecutor stated that her reason for striking Denise Taylor, a black female, was that her uncle was charged and eventually acquitted of rape and she appeared to be defense oriented. The defendant argues that the prosecution did not strike white jurors whose relatives had been convicted of crimes.

■ While it is true that there were two white jurors on the panel that had relatives who were convicted of crimes, these crimes were nonviolent in nature. Coffey, a white male, had a brother who was convicted of carrying a concealed weapon. Gaffney, a white female, had a sister who was convicted of embezzlement. The only other juror who had a relative charged with a violent crime was Stewart, a black female, who was also struck by the state. It is not unreasonable to believe that a person who

had a close relative who was charged and later acquitted of a violent crime might tend to be resentful toward the prosecution and perceived to be defense oriented. We find no evidence of racial discrimination in this strike.

The second black person struck was Crittenden, a black male, who stated he did not agree with the law of acting with another. Further, he had been assaulted in a pool room but did not prosecute in that case. The defendant argues that although Crittenden disagreed with the law of acting with another, he stated that he could follow the law, unlike a white juror who expressed similar doubts and was "lukewarm on being rehabilitated". The record does not show that Schoellhorn, the white juror, had ever been the victim of a crime. Again, it is not unreasonable for the prosecutor to have a "hunch" that a person who personally disagrees with the concept of complicity and who has failed to prosecute an assault on himself may be defense oriented. Batson allows the state to exercise its peremptory challenges on the basis of hunches as long as there is no racial motive. *Id.* at 65.

The reason the state gave for striking Stewart and Snadon, black females, was that both expressed hesitancy to serve on the jury because they might lose their jobs if they were absent for any length of time. Further, Stewart had a brother who had been convicted of bank robbery. The prosecutor stated that it was not her policy to make persons serve on the jury who would be distracted from their service by concern over the possible loss of their jobs. This statement is supported by the fact that Kremer, a white juror who expressed similar concern for her job, was struck for cause. We find no racial motivation behind these strikes.

The one black juror who was left on the panel was Tate who had testified in court as a robbery victim and had a brother who was murdered. She was struck by the defendant. After review of the record we find the explanations offered by the prosecutor were legitimate, clear, reasonably specific and were not racially motivated.

The action of the trial court in failing to quash the jury panel was not clearly erroneous.

In his third point the defendant argues that the admission of a portion of Renea Henderson's testimony was erroneous. The following discourse took place on direct examination:

Q  And what did he [defendant] say on the next call?

A  He called me again and asked me was I going out of town and I told him no, I wasn't. And he told me all I had to do was go out of town and stay till the trial was over. And I told him we didn't have the money to go out of town. And then he was really mad. He was telling me about what he was going to do to people when he got out.

Q  Did he say specifically what he would do to people when he got out?

MR. CHILDRESS: Your Honor, I object. I have let this line of questioning go on for awhile. I'm not sure of the relevancy of this line. Her claim that my client threatened someone, I don't think that's relevant to this case.

THE COURT: Overruled.

MS. BERKBIGLER: Go ahead.

Q  Did he say what he was going to do?

A  Yes, sir.

Q  What did he say?

A  Well, he was mad at his girlfriend Stella. He told me when he got out that he was going to kill Stella. And I just laughed at him, and asked him why, and he said that she was tricking. Then he also told me that he was going to kill his cousin they call Shang, her name is Elaine.

The defendant argues that threats against third parties are inadmissible and tended to portray the defendant as a violent and dangerous man. He argues that the admission of such testimony over his objection was prejudicial error. We disagree.

Evidence of acts, conduct, and declarations of the accused including attempts to conceal the crime, while not sufficient in themselves are admissible to show con-

sciousness of guilt. *State v. Goforth*, 535 S.W.2d 464, 467 (Mo.App.1976). If it is shown that an accused directly, or indirectly through a third person at the urging of the accused or with his knowledge and consent, destroys, suppresses or fabricates evidence, or by any means threatens or persuades a witness to give false testimony, such showing is properly admissible as evidence to establish the accused's guilt on the original charge and to show consciousness of guilt. *State v. Hicks*, 535 S.W.2d 308, 311 (Mo.App.1976).

The record shows that the statements set forth above were a small but integral part of a larger plan designed to frighten Renea Henderson from testifying at trial. After his arrest, defendant made numerous phone calls to Renea. He informed her that he was aware that she had given damaging evidence to the police. He urged her to leave the state to avoid testifying or to "plead the Fifth Amendment." When Renea told defendant she would not leave the state, he got angry and told her he was going to kill his girlfriend and cousin. These statements were followed by numerous phone calls and letters in which defendant again urged Renea to leave the state and attempted to fabricate evidence.

After examination of the entire series of conversations between Renea and the defendant, it becomes clear that the implication of the threats against the cousin and girlfriend was that Renea may be next if she refused to cooperate. The statements at issue were an integral part of a larger scheme to frighten Renea from testifying and as such were admissible to show consciousness of guilt. Point denied.

The judgment of the trial court is affirmed.

STEPHAN, P.J., and DOWD, J., concur.