**STATE of Missouri, Plaintiff–Respondent,**

v.

**Terressa L. CUMMINGS, Defendant–Appellant.**

**No. 25624.**

Missouri Court of Appeals,
Southern District,
Division Two.

May 20, 2004.

**96**

Craig Johnston, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Shaun J. MacKelprang, Asst. Atty. Gen., Jefferson City, for respondent.

JEFFREY W. BATES, Judge.

Terressa L. Cummings ("Defendant") was charged by amended information with committing the class A felony of murder in the first degree, in violation of § 565.020, by asphyxiating Melissa Rose Saggert Boviall ("Victim").[1] A jury found Defendant guilty of this offense. Because the State had waived the death penalty and Defendant was a prior offender, the trial court determined punishment and sentenced Defendant to imprisonment for life without eligibility for probation or parole. *See* § 558.016; § 557.036.2(2); § 565.020.2. Defendant appeals, presenting five points for our determination. These points involve the sufficiency of the evidence to support Defendant's conviction, as well as asserted trial errors that occurred during *voir dire*, the admission of evidence and closing argument. We affirm.

### Statement of Facts

Victim resided in Joplin with her husband, Dick Boviall ("Boviall"). Although Victim lived with Boviall, she was an alcoholic and was frequently absent from home for days at a time. During the

---

1. All references to statutes are to RSMo 2000 unless otherwise indicated.

summer of 1999, Victim met Ronnie Johnson ("Johnson"), and the two became friends. Johnson visited Victim's home, and she sometimes stayed with Johnson in his apartment.

Defendant moved from Illinois to Joplin, Missouri, on April 15, 2000. When she arrived, her only possessions were her clothing and an automobile. She initially stayed at the home of her ex-husband, Otis Cummings ("Cummings"), for several weeks. While staying there, Defendant first met Johnson when he stopped by Cummings's home and assisted Defendant in loading some appliances into a vehicle.

On June 20, 2000, Defendant and Johnson met a second time at a Joplin bar. Johnson was there with a former girlfriend and Victim. After meeting this second time, Defendant and Johnson became romantically involved and started living together. At that time, however, Defendant and Johnson were living a hand-to-mouth existence because they were both unemployed and homeless. Victim was taking care of a vacant house located at 102 McCoy Street in Joplin ("the McCoy house") while the owner was in prison. She offered to let Defendant and Johnson live there so they would have a place to stay. They moved into the McCoy house around the first week of July. In mid-July, Defendant and Johnson got engaged, and Johnson gave Defendant an engagement ring. At approximately this same point in time, Victim also began staying with Defendant and Johnson in the McCoy house.

After Victim began living in the McCoy house with Defendant, considerable animosity developed between the two women. During the two weeks preceding Victim's murder, this animosity manifested itself constantly. Defendant and Victim argued about how to divide money they had stolen from an intoxicated patron at a club. Victim accused Defendant of trying to take over Victim's place in her own household because Defendant sometimes did laundry, dishes and other household chores for Boviall in order to earn extra money. Victim also accused Defendant of having an affair with Boviall. Defendant, in turn, believed Victim and Johnson were having an affair. Victim flirted with Johnson and was "handsy" around him, despite the fact that Defendant and Johnson were engaged. Victim twice asked Johnson to have sex with her.

On one occasion, Defendant returned home in the early morning hours after she and Johnson had argued. While Defendant was standing outside the house, she heard Victim and Johnson having sex in the bedroom. Defendant immediately went to get Victim's husband, Boviall, even though it was 2:30 or 3:00 o'clock in the morning. Defendant was "very angry" when she arrived at Boviall's house. She told Boviall that Victim was having an affair with Johnson, and he'd better get Victim out of there. When Defendant and Boviall returned to the McCoy house, the front door was locked. Defendant began kicking the door and yelling at Johnson and Victim. Once inside, Boviall got Victim and took her back to her own house.

On another occasion, Defendant came to Boviall's house after performing some community service. Johnson and Victim were both there, and each appeared to have just taken a shower. Defendant suspected that they had been having sex before she arrived. Defendant and Johnson had numerous conversations about Victim coming between them, and she repeatedly accused Johnson of having an affair with Victim.

On the Saturday evening prior to the murder (7/29/00), Defendant, Johnson and Victim were at a club in Joplin. Victim was touching Johnson and flirting with

him. Johnson felt that Victim was "coming on" to him. While she was dancing with Johnson, Defendant came up, pulled Victim away, and took her place. Victim's words and actions made Defendant jealous. Victim had too much to drink and was sent to the McCoy house by taxi about 12:30 a.m.

Defendant and Johnson arrived home on Sunday morning (7/30/00) at 2:30 a.m. Victim was lying on the couch listening to music. A few minutes after Defendant and Johnson went to bed, Victim starting talking to herself and made the statement that if it wasn't for Defendant, Victim and Johnson would be together. Defendant immediately got out of bed, went into the living room and began arguing and fighting with Victim. When Johnson came into the room a few minutes later, Defendant again accused him of having an affair with Victim. Defendant slapped Victim's face at least twice, causing her to have two black eyes and a cut lip. Victim threatened to call the police, but Johnson talked her out of it and got both women to calm down. The three of them stayed up the remainder of the night.

About 8:00 a.m. that Sunday morning, Johnson suggested the three of them go hunting for arrowheads since Johnson and Victim were both Native Americans and had an interest in Indian artifacts. Johnson wanted to go to a farm in Dade County where he had hunted for arrowheads many times, but Defendant's car did not have sufficient gas to make the trip. Johnson was able to borrow some money from a friend named Russ Waldo. Waldo accompanied them to the gas station so he could pay for the purchase. Defendant drove, and Waldo rode in the front passenger seat of Defendant's car. Victim, who was in the back seat of Defendant's car with Johnson, flirted with Waldo while the car was stopped at the gas station. Victim rubbed his shoulder and said, "You're a big ol' boy." Defendant slapped Victim and told her to keep her hands off Waldo because he was married.

Once the group arrived in Dade County, Defendant gave Victim a pair of Defendant's high-top tennis shoes to wear because Victim had no shoes. The group began searching for artifacts. Victim picked a flower and gave it to Johnson. Defendant took it from him and threw it away. Johnson left the women and began searching for artifacts by himself.

After a couple of hours, Johnson heard an angry argument occurring. When he returned to where the women were, he heard Defendant telling Victim that she couldn't be satisfied with other people's happiness and was trying to ruin things. Defendant was holding a fist-sized rock in her hand. The left side of Victim's face was very swollen, and Defendant told Johnson that she thought Victim's jaw was broken. Victim threatened to call the police and send Defendant to prison where she would not be able to see her children anymore.[2] Defendant told Johnson that she was not going back to jail. She instructed him to get something to tie Victim up.

Johnson was not able to find any restraints, so he returned. Defendant was standing beside Victim, who was naked. Defendant again told Johnson to go find something to restrain Victim. When Johnson returned the second time, Victim was dressed (minus her panties and bra), and her nose was bleeding. Defendant removed the shoelaces from Victim's tennis

2. In order to place Victim's remarks in context, we note that Defendant had prior felony convictions in Missouri, Florida and Mississippi. She had served time in prison in Missouri and Florida. She also had two children from her marriage to Cummings.

shoes and tied her wrists with the shoe-string. Defendant then wrapped the wire around Victim's wrists to bind them. Defendant used a small stick to gag Victim with her panties and wrapped Victim's bra around her head to hold the gag in place. Victim was walked into the woods, where her ankles were tied together with the other shoestring and also secured with wire. Victim was left lying on the ground with her arms tied to a tree branch above her head and large branches piled around her. Defendant told Johnson she was going to leave Victim and make her sit and think about it for a while.

As Defendant and Johnson were leaving, Victim was somehow able to loosen or remove her gag and began screaming for help. Defendant and Johnson had only walked about 30–35 yards from where Victim was lying. When Defendant heard Victim yelling, she smiled at Johnson and told him she'd be right back. Johnson remained where he was while Defendant went back to where Victim was lying to reapply the gag. It only took Defendant about one minute to walk back to where Victim was lying. Johnson heard no more noises from Victim.

The testimony from the State's pathologist, Dr. Doug Anderson, established that Victim died from asphyxiation. The panties used as a gag had been pushed so far into Victim's mouth that she was not able to breathe through either her nose or mouth. Victim's bra had been placed underneath her tongue and tied tightly around her head to hold her tongue back. This method of gagging Victim caused her to become unconscious and die of asphyxiation in less than six minutes.

Defendant did not return to where Johnson was standing until 15 minutes had elapsed. When she returned, she was carrying all of Victim's jewelry (20–25 bracelets, some rings, two necklaces and a watch) as well as the shoes Victim had been wearing. Defendant told Johnson she loved him and then said, "That will hold her." Defendant directed Johnson to lift up a large rock so she could hide Victim's jewelry underneath it.

When Defendant and Johnson left the scene, Defendant told him not to go to Golden City because he had a number of outstanding traffic warrants, and she did not want him to get arrested. They went to the home of the Masters, who were friends of Johnson living in Miller. During this visit, the Masters observed Defendant and Johnson sitting close together, holding hands and kissing. As they were leaving Miller, Johnson told Defendant that they needed to go get Victim. Defendant declined and drove back to Joplin. Upon arriving in Joplin, they went to the home of Victim's husband. While there, they ate supper with Victim's husband and Defendant washed the clothes she and Johnson had been wearing in Dade County.

On Monday (8/01/00), Johnson again told Defendant they needed to go get Victim. Defendant said they would do so in a little bit, but they did not return to Dade County that day. Defendant claimed she had several things to do and was gone for a while. This same day, Johnson observed Defendant pull her car up to a dumpster and throw away the tennis shoes and hiking boots that Victim and Defendant, respectively, had been wearing while they were in Dade County. Defendant told Johnson they needed to get rid of these items.

When Johnson got up on Tuesday morning (8/2/00), he insisted that they go get Victim because she had been left outside for 36 hours. He and Defendant drove back to Dade County. When they arrived, Defendant sent Johnson to look for Victim. Defendant told him she would rather hunt

for arrowheads. Johnson discovered Victim's partially decomposed body. When he returned, Defendant asked if it was bad. Johnson told her Victim was dead. Defendant did not seem upset and simply said, "Come on. I've got to be in Neosho for court this afternoon."

On Friday (8/4/00), Defendant went to Cummings' house to get marijuana. When she returned, Johnson told her to get her stuff and leave. Defendant returned to Cummings' house to stay with him.

On Saturday (8/5/00), Defendant called the Joplin Police Department. She claimed to have witnessed a murder and told police she could take them to the body. Defendant then met with the police and led them to Victim's location. Defendant told the police Johnson had killed Victim.

On Sunday (8/6/00), Johnson was arrested and charged with first degree murder for killing Victim. He was interviewed by three investigators from the Missouri Highway Patrol and provided them with information implicating Defendant in the crime. Defendant was interviewed by the same investigators later that day. At the conclusion of Defendant's interview, she was arrested and also charged with first degree murder because her account of what had occurred in Dade County contained many inculpatory discrepancies and inconsistencies.

In November 2002, Johnson pled guilty to kidnapping and felony murder for causing the death of Victim by asphyxiation while kidnapping her. His plea agreement required him to testify against Defendant. If he successfully complied with that condition, he would receive concurrent sentences of 20 years for felony murder and 15 years for kidnapping.

At trial, Johnson and Defendant each claimed the other killed Victim. The case was submitted to the jury using instructions that permitted the jury to return a verdict on the offense of kidnapping and on one of the following offenses: (1) murder in the first degree; (2) conventional murder in the second degree; (3) felony murder in the second degree; (4) voluntary manslaughter; or (5) involuntary manslaughter. The jury returned a verdict finding Defendant guilty of murder in the first degree, and she appeals. Additional facts will be provided as needed during our analysis of the points presented by Defendant's appeal.

## Discussion and Decision

### 1. Sufficiency of the Evidence as to Deliberation

In Defendant's first point, she contends there was insufficient evidence from which the jury could have found that Defendant deliberately asphyxiated Victim. Defendant concedes there was evidence she regagged Victim, but she argues this evidence was insufficient to prove she knew the gag would asphyxiate Victim.

When reviewing the sufficiency of evidence to support a criminal conviction, this Court does not act as a " 'super juror' with veto powers," *State v. Grim*, 854 S.W.2d 403, 414 (Mo. banc 1993). Instead, we give great deference to the trier of fact. *State v. Chaney*, 967 S.W.2d 47, 52 (Mo. banc 1998). In this appeal, "appellate review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989). In applying this standard, "the Court accepts as true all of the evidence favorable to the state, including all favorable inferences drawn from the evidence, and disregards all evidence and inferences to the contrary." *Id.; see also Chaney*, 967 S.W.2d at 52.

■ Defendant is correct that deliberation is a required element which must be proved to support a conviction for first degree murder. *See* § 565.020.1. Deliberation, however, is defined to mean "cool reflection for any length of time no matter how brief[.]" § 565.002(3). Direct evidence of deliberation is not required. *State v. Parkus*, 753 S.W.2d 881, 884 (Mo. banc 1988). "[I]nstead, the mental elements establishing murder may be proved by indirect evidence and inferences reasonably drawn from the circumstances surrounding the slaying." *Id.; see also State v. Endres*, 698 S.W.2d 591, 594 (Mo.App. 1985) (direct proof of the requisite mental state is seldom available and is usually inferred from circumstantial evidence). In our view, the evidence and inferences favorable to the verdict were sufficient for a reasonable juror to conclude that Defendant deliberated prior to killing Victim.

The jury heard a substantial amount of evidence concerning the animosity existing between Victim and Defendant during the two-week period before Victim's murder. They argued about money and leveled mutual accusations of infidelity against each other. In Defendant's case, however, the fact that Victim was making sexual advances toward Johnson made Defendant very angry. Defendant's anger manifested itself in the form of significant physical violence against Victim the night before, and the day of, the murder. Furthermore, Defendant had a criminal record and had been in prison. When Victim threatened to report Defendant to the police for assaulting Victim, Defendant told Johnson that she was not going back to prison. From this statement, the jury could infer that Defendant intended to take whatever steps were necessary to silence Victim. It was after Defendant made this remark to Johnson that she immediately set in motion a plan to bind and gag Victim and lead her to a place of seclusion in the thick woods. Once Defendant and Johnson prepared to leave, Victim was able to loosen or remove her gag and begin screaming for help. At that point, it was Defendant who went back and regagged Victim in such a manner that she quickly asphyxiated.

Defendant argues, however, that even if she was the one who regagged Victim, there was insufficient evidence to prove that Defendant knew the gag would asphyxiate Victim. We disagree. The medical testimony at trial, which was uncontradicted, established that Victim asphyxiated because the panties used to gag her were pushed so far back into her throat that Victim could not breathe through either her nose or her mouth. Her bra also was placed under her tongue and tightly tied so as to hold her tongue back against the gag. Victim would have suffocated in less than six minutes, and she would have become unconscious even more quickly. When Defendant returned to regag Victim, Defendant was only a one-minute walk away from Johnson. Defendant was gone 15 minutes. Therefore, the jury could infer that Defendant stayed with Victim long enough to watch her become unconscious and die before returning to Johnson.

Defendant's actions after returning to Johnson likewise support the inference that Defendant already knew Victim was dead. As soon as she came back, she immediately told Johnson that she loved him and that what she had done "would hold" Victim. She brought Victim's jewelry with her and had Johnson assist her in hiding it. Once they arrived in Miller, Defendant and Johnson were very affectionate with each other, holding hands and kissing. Upon arriving at Victim's husband's house in Joplin, Defendant washed the clothes she and Johnson had been wearing. The next day, she told Johnson that she needed to get rid of the shoes she

and Victim had been wearing at the scene of the crime. Defendant proceeded to throw each pair of shoes into a dumpster. Finally, Defendant initially resisted Johnson's attempts to return and get Victim. When they did, Defendant showed little reaction after being told Victim was dead.

Based on this evidence, we conclude a reasonable juror could have found beyond a reasonable doubt that Defendant deliberated before causing Victim's death. We find ample support for this conclusion in *State v. Simmons*, 955 S.W.2d 752 (Mo. banc 1997). There, defendant was found guilty of first degree murder for asphyxiating his bound victim with a gag. On appeal, Simmons argued that the evidence was insufficient to prove the required element of deliberation. The Missouri Supreme Court rejected Simmons' argument and affirmed his conviction:

> Simmons also contends that the evidence was insufficient to prove deliberation. The victim, however, was bound at the hands and ankles, had a cloth shoved down her throat and held in place with another binding, and was left in this condition in a bathtub. These factual circumstances and the time necessary to accomplish them justify the inference that appellant deliberated in the murder. In conclusion, we hold that there was sufficient evidence for a reasonable juror to find Simmons guilty beyond a reasonable doubt of first degree murder.

*Id.* at 765 (citation omitted). Defendant's first point is denied.

### 2. Admission of Defendant's Statement about Going Back to Jail

■ In Defendant's second point, she contends that the trial court erred in ad-

mitting Johnson's testimony concerning Defendant's statement, just prior to binding and gagging Victim, that Defendant was not going back to jail. Defendant argues that the word "back" in this statement impermissibly referred to evidence of other crimes.

As we undertake to review this point, we are mindful that a trial court has broad discretion in determining the admissibility of evidence. *State v. Churchill*, 98 S.W.3d 536, 538 (Mo. banc 2003). Therefore, a trial court's decision to admit evidence will not be disturbed unless a clear abuse of discretion is shown. *State v. Williams*, 976 S.W.2d 1, 2 (Mo.App.1998). A decision to admit evidence constitutes an abuse of discretion only when it is clearly against the logic of the circumstances then before the trial court and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration. *State v. Dowell*, 25 S.W.3d 594, 602 (Mo.App.2000).

■ We agree with Defendant that her statement about not going "back" to jail does constitute evidence that she previously had been convicted of a crime. *See State v. Brown*, 670 S.W.2d 140, 141 (Mo. App.1984); *State v. Brooks*, 675 S.W.2d 53, 57–59 (Mo.App.1984). That being so, however, her statement is not *ipso facto* inadmissible. While the general rule is that evidence of other crimes normally is not admissible, *State v. Edwards*, 116 S.W.3d 511, 533 (Mo. banc 2003), this rule is subject to a number of important exceptions.[3] For example, "evidence of other crimes is admissible for certain purposes, such as to show motive, intent, lack of accident or

---

**3.** The rationale for the general rule is to prevent evidence of prior uncharged misconduct from being admitted for the purpose of showing a defendant's propensity to commit similar crimes in order to prove he or she is guilty

of the crime charged. *See State v. Barriner*, 34 S.W.3d 139, 144 (Mo. banc 2000); *State v. Gilyard*, 979 S.W.2d 138, 140 (Mo. banc 1998).

mistake, or common scheme or plan." *Id.* "An additional exception is recognized for evidence of uncharged crimes that are part of the circumstances or the sequence of events surrounding the offense charged. This evidence is admissible to present a complete and coherent picture of the events that transpired." *State v. Morrow,* 968 S.W.2d 100, 107 (Mo. banc 1998) (citation omitted).

We conclude that the trial court did not abuse its discretion in admitting in evidence Defendant's statement about not wanting to go "back" to jail. This evidence was admissible to show her motive for wanting Victim dead and to present a complete and coherent picture of the events leading to Victim's murder. *See State v. Depriest,* 822 S.W.2d 488, 490–91 (Mo.App.1991) (defendant's statement that he shot officer pursuing him because defendant "didn't want to go back to prison" was properly admitted to show defendant's motive for the shooting); *State v. Sellers,* 710 S.W.2d 398, 400–01 (Mo.App.1986) (defendant's statement that he wasn't going back to jail was admissible to prove intent); *State v. Perkins,* 680 S.W.2d 331, 333–34 (Mo.App.1984) (witness' testimony that defendant asked her not to call the police because they would just send him back to jail was properly admitted to show intent and to give a complete story of the events involved in the offense); *State v. Allbritton,* 660 S.W.2d 322, 328–29 (Mo. App.1983) (witness' testimony that defendant refused to leave her apartment without note containing information identifying defendant because "he wasn't going back to the pen" was properly admitted to show motive and to permit the witness to fairly and adequately explain the circumstances of the offense).

■ Even if the trial court erred in admitting this evidence, Defendant still would not be entitled to a reversal and retrial. In matters involving the admission of evidence, we review for prejudice, not just error, and we will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial. *State v. Anderson,* 76 S.W.3d 275, 277 (Mo. banc 2002). Here, Defendant suffered no prejudice from the trial court's ruling because, in response to questions asked by her own lawyer on direct examination, she told the jury that she had been convicted of three prior felonies and had served time in prison. *See State v. Osterloh,* 773 S.W.2d 213, 217 (Mo.App.1989) (a defendant cannot be prejudiced by admission of objectionable evidence if he offers similar evidence); *State v. Schwendt,* 645 S.W.2d 385, 387 (Mo.App.1983) (a defendant cannot be prejudiced by alleged inadmissible evidence if he offers evidence to the same effect as the challenged evidence).

In an effort to avoid the result of cases such as *Osterloh* and *Schwendt,* Defendant argues that if the trial court had excluded her statement, she may have decided not to testify. Defendant's assertion has no merit. The defense theory presented in her opening statement was that Johnson murdered Victim, and Defendant participated in a minimal fashion only because she was afraid. In describing the evidence that would be presented to support such a theory, Defendant's attorney discussed a version of events that could only come from Defendant's testimony.[4] To us, this demonstrates rather convincingly that Defendant always intended to testify in her own behalf at trial. Defendant's second point is denied.

4. For example, in describing the anticipated testimony, defense counsel told the jury that, as Johnson began binding Victim, Defendant became "concerned for her own safety as well as the safety of [Victim]." No witness other than Defendant could provide such evidence.

### 3. Failure to Declare a Mistrial Sua Sponte

Defendant's third point on appeal asserts that the trial court erred in not declaring a mistrial, *sua sponte*, after Johnson testified during his direct examination that Defendant had "rolled" someone at a bar by taking his money after he passed out. Defendant concedes that this error was not properly preserved because there was no objection to the testimony at trial, and the matter was not included in Defendant's motion for new trial. Defendant requests that this Court review for plain error pursuant to Rule 30.20.[5]

Plain error review is discretionary. *See State v. Thurston*, 104 S.W.3d 839, 841 (Mo.App.2003); *State v. Smith*, 33 S.W.3d 648, 652 (Mo.App.2000). For relief under the plain error rule to be warranted, a defendant must demonstrate "the error so substantially affected the defendant's rights that a manifest injustice or a miscarriage of justice would inexorably result if the error were to be left uncorrected." *State v. Deckard*, 18 S.W.3d 495, 497 (Mo. App.2000). Thus, we cannot grant Defendant a new trial based on plain error unless the error was "outcome determinative." *Deck v. State*, 68 S.W.3d 418, 427 (Mo. banc 2002); *State v. Armentrout*, 8 S.W.3d 99, 110 (Mo. banc 1999).

A request for plain error review requires us to go through a two-step analysis. *State v. Scurlock*, 998 S.W.2d 578, 586 (Mo.App.1999). First, we determine whether the asserted claim of plain error facially establishes substantial grounds for believing a manifest injustice or miscarriage of justice has occurred. *State v. Stanley*, 124 S.W.3d 70, 77 (Mo.App.2004). In effect, we must determine "whether, on the face of the claim, plain error has, in fact, occurred." *State v. Dudley*, 51 S.W.3d 44, 53 (Mo.App.2001); *State v. Brown*, 97 S.W.3d 97, 100 (Mo.App.2002). Only if facially substantial grounds are found to exist do we then move to the second step of this analysis and determine whether a manifest injustice or miscarriage of justice has actually occurred. *Stanley*, 124 S.W.3d at 77.

We begin our analysis by considering whether Defendant's assertion of plain error is facially substantial. During Johnson's direct examination, he was asked about various incidents which created animosity between Victim and Defendant prior to the murder. The challenged testimony came during his answers to this line of inquiry:

Q. Prior to that incident and that allegation by [Defendant] of you and [Victim] sleeping together; did [Victim] ever argue with [Defendant] regarding money?

A. Yes.

Q. And what was that argument about?

A. [Defendant] and [Victim] had rolled an old boy down by Marvin's Hi-Ball. He'd walked outside and passed out and they'd walked out and rolled him of what cash he was carrying. And they'd divided it up and then later on [Victim] wanted more of the money or whatever and of course [Defendant] told her no and that's what that was all about.

As in the prior point, Defendant contends the admission of this testimony impermissibly revealed other uncharged crimes to the jury. We disagree. Victim was first restrained, bound and gagged by Defendant after Victim threatened to call

---

**5.** All references to rules are to the Missouri Rules of Criminal Procedure 2004 unless otherwise indicated.

the police and get Defendant put back in prison where she could no longer see her children. Defendant's act of stealing money from a drunk constituted but one of several crimes, committed by Defendant and witnessed by Victim, which Victim could have reported to police in order to make good on her threat to send Defendant back to prison. Therefore, Johnson's testimony showed Defendant had a motive for killing Victim. The admission of this evidence was not error, plain or otherwise. *See State v. Edwards*, 116 S.W.3d 511, 533 (Mo. banc 2003). We deny Defendant's third point because her assertion that the trial court committed plain error by failing to declare a mistrial, *sua sponte*, is not facially substantial.

### 4. The State's Closing Argument Comment about Comparative Credibility

■ In Defendant's fourth point, she contends the trial court erred in overruling her objection to a comment made during the State's closing argument about the comparative credibility of Johnson and Defendant. Defendant argues that the trial court's ruling was in error because: (1) it was inconsistent with an earlier ruling the court had made on a pretrial motion *in limine;* and (2) the argument was factually incorrect. In order to understand Defendant's argument, some additional factual exposition is required.

During a pretrial motion hearing, the State moved *in limine* to preclude Defendant from questioning venirepersons during *voir dire* about the range of punishment. The trial court sustained the motion because Defendant was a prior offender and would be sentenced by the court if found guilty. During Johnson's testimony, the jury was told that: (1) he was originally charged with first degree murder and faced a possible sentence of

life imprisonment without the possibility of probation or parole; (2) pursuant to a plea bargain with the State, he had pled guilty to felony murder and kidnapping; and (3) if he testified truthfully at Defendant's trial, he would receive a total sentence of 20 years in prison. During the State's closing argument, the prosecutor made the following argument:

> Despite some of the credibility issues that are inherent with Ron Johnson's testimony, I believe it is safe to say that he turned out to be a more credible witness than [Defendant]. Of course, she's got more to lose. She doesn't have the ear of the authorities anymore. She faces a more severe sentence. She's been to the pen twice. Ron, on the other hand, has successful[ly] completed his . . . .

Defense counsel objected on two grounds: (1) the trial court's ruling on the motion *in limine* meant the attorneys could not talk about Defendant's punishment; and (2) the argument was inaccurate because Johnson still faced the same potential punishment as Defendant. The prosecutor denied that the ruling on the motion *in limine* prevented any discussion of punishment at all during the trial. The trial court overruled the objection and denied defense counsel's request to discuss Defendant's range of punishment. The prosecutor then concluded his argument by noting that, despite the many statements Johnson had given police and prosecutors about the murder, defense counsel had been unable to point out any significant inconsistencies in his testimony.

■ A trial court has wide discretion in controlling the scope of closing argument. *State v. Barton*, 936 S.W.2d 781, 783 (Mo. banc 1996). It is a prosecutor's right to comment on the credibility of witnesses from the State's viewpoint. *State v. Bryant*, 741 S.W.2d 797, 799 (Mo.App.

1987). Whether a prosecutor has exceeded the broad leeway permitted in making such a comment is a matter for the trial court to determine in the exercise of its sound discretion. *Id.* We will not reverse a trial court's decision concerning the allowable scope of closing argument unless we conclude that the ruling was an abuse of discretion and the argument was prejudicial. *See State v. Shurn,* 866 S.W.2d 447, 460 (Mo. banc 1993); *State v. Edwards,* 116 S.W.3d 511, 537 (Mo. banc 2003).

At trial, Defendant and Johnson each blamed the other for killing Victim. Therefore, the principal issue for the jury to resolve was who was telling the truth. In order to persuade the jury that Johnson was the more credible witness, the prosecutor articulated various reasons Defendant had to lie, including the severity of punishment she faced if convicted. This was a proper argument. *See State v. Grisby,* 867 S.W.2d 270, 272–73 (Mo.App.1993) (prosecutor's argument that defendant was not credible because he was a twice-convicted felon who would do anything to avoid going to prison was proper since the argument raised defendant's motive to lie and was confined to the issue of his credibility).

We do not agree with Defendant that this argument was precluded by the pretrial ruling on the motion *in limine.* The trial court did not interpret its prior order to have that effect. We believe its decision was correct since the issue that arose in closing argument was different than the issue presented in the State's pretrial motion. There was no need to question venirepersons during *voir dire* as to their views on range of punishment when they would play no role in determining punishment. At trial, on the other hand, the jurors had the sole responsibility of determining whether Johnson or Defendant was more believable. To that end, it was en-tirely proper for the State to remind jurors during closing argument that, in deciding this factual question, they could consider the potential punishment Defendant faced if convicted.

Defendant also argues that the prosecutor's argument was factually incorrect because Johnson still faced the same punishment as Defendant since he had not yet been sentenced. As the jury was aware of the conditions placed upon Johnson's plea agreement, it was up to the jury to assess the accuracy of the prosecutor's statement that Defendant faced a more severe sentence than Johnson as of the date of trial.

■ Even if the State's argument was improper for either of the reasons suggested by Defendant, reversal is not required due to an absence of prejudice. In Defendant's closing argument, her counsel responded to the State's argument in the following fashion:

So, you're going to have to decide who's telling the truth and it essential[ly] comes down to a swearing contest between Ronnie Johnson and [Defendant].

Why would Ron lie? What possible reason would Ron lie? Well, the reason's a good one: Ron Johnson was facing life in prison without the possibility of probation or parole for the murder of [Victim]. That's what he was facing . . . .

. . . .

Do you think someone would lie to avoid the rest of their life in prison? Do you think somebody would lie to make sure those prison doors would open up for them someday? Do you think Ron would lie to make sure that prison door opens up for him? . . . .

. . . .

So, [Ron] had to result—resort, excuse me, to the ultimate desperate ploy of the truly guilty: he plea bargained.

When all else fails, I'll plea bargain, I'll take a lesser sentence. And I'll go in there and I'll testify against [Defendant] and I'll say she did it. He plea bargained. The ultimate, desperate ploy of the truly guilty.

Ron Johnson knew he was facing life in prison without the possibility of probation or parole, so he agrees to plead guilty to murder in the second degree and do twenty years. On that murder in the second degree charge, he was facing ten to thirty or life. And he gets a pretty minimal sentence for his responsibility in this act.

In our view, defense counsel effectively negated the State's argument by pointing out that Johnson's own credibility was suspect since he had an equally strong incentive to lie in order to receive a favorable plea bargain. *State v. Ware*, 793 S.W.2d 412 (Mo.App.1990), upon which Defendant relies, is distinguishable. In *Ware*, the prosecutor improperly argued in rebuttal that the jury should consider punishment in determining Defendant's guilt. *Id.* at 414–15. Here, the prosecutor's argument was confined to an attack on Defendant's credibility, and defense counsel had the opportunity to strongly challenge the State's argument in Defendant's own closing argument. Defendant's fourth point is denied.

### 5. The State's Voir Dire Questions

In Defendant's final point, she contends that, while questioning the venire during *voir dire*, the State misstated the law in describing the elements necessary to convict Defendant of first degree murder. Defendant argues that an example used by the State in questioning the panel failed to distinguish first degree murder from other degrees of murder. This asserted error arose in the following manner.

Defendant was charged by amended information with first degree murder. The information also alleged that, in committing this offense, Defendant acted in concert with Johnson. Therefore, the State's case against Defendant involved principles of accomplice liability. *See* § 562.036; § 562.041.1. Finally, the information specifically placed Defendant on notice that the State might submit a felony murder instruction against Defendant at trial, based on Victim's death during the perpetration of a kidnapping.

During *voir dire*, the prosecutor explained that "[f]irst degree murder requires that any defendant charged with it has the purpose to cause the death of the victim and the defendant did so after deliberation. And that deliberation is defined under the law as cool reflection upon the matter for any length of time, no matter how brief." When the prosecutor inquired whether anyone would be unable to follow an instruction requiring these findings, no one responded.[6]

The prosecutor then told the venire that she anticipated the trial court would give an instruction on felony murder at the conclusion of the trial. She explained this crime in the following language: "Felony murder is when someone is killed during the commission of a felony." The prosecutor immediately moved to her next topic of inquiry, which concerned the concept of accomplice liability. She did so by using a hypothetical that combined her prior discussion of felony murder with her current discussion of accomplice liability:

BY MS. STEMMONS: Okay. Two guys decide to rob the bank. Okay.

---

**6.** This is a correct statement of Missouri law. *See* § 565.020.1 and § 565.002(3). Defendant does not contend otherwise.

They intend to rob the bank. One drives the car and stays outside as the lookout. One goes into the bank and actually holds up the teller. Under the law, they are equally responsible for the robbery and can each by [sic] found guilty, even though the guy driving the car and the lookout never went inside the bank. Is there anyone that does not understand that? (No hands raised.)....

I'm going to take it one step further. The guy that goes in the bank shoots a security officer. Okay? Now, the guy sitting out in the car, that drove the car and is lookout never intended for anyone to get killed.

BY MR. PERRY: Judge, I object to the illustration.

THE COURT: Objection will be overruled, you may continue.

BY MS. STEMMONS: Thank you, Your Honor. But someone is killed inside the bank. Is there anyone that disagrees with the proposition that the lookout driver can be found guilty of the murder of the security guard?

Ultimately, 12 venirepersons disagreed with this principle of accomplice liability arising from a felony murder scenario. Five expressed concern that they would have difficulty following a jury instruction requiring this result. One stated that she could not follow an instruction requiring this result, and she was later stricken for cause for this reason.

It is the State's use of this bank robbery example which, according to Defendant, misstated the law by failing to distinguish first degree murder from other degrees of murder. Defendant argues this error requires reversal and retrial.

■ As a preliminary matter, we note that defense counsel made only a general objection to the prosecutor's question. Therefore, this point is not properly preserved for appellate review.[7] *See State v. Lang*, 515 S.W.2d 507, 511 (Mo.1974); *State v. Smith*, 355 Mo. 59, 194 S.W.2d 905, 907 (1946). We may review only for plain error. Defendant is not entitled to such review unless we first determine that her asserted claim of error facially establishes substantial grounds for believing a manifest injustice or miscarriage of justice has occurred. *State v. Stanley*, 124 S.W.3d 70, 77 (Mo.App.2004). We cannot reach that conclusion here for three reasons.

■ First, during the State's *voir dire* of the panel, the prosecutor correctly recited the elements necessary to convict someone of first degree murder. The challenged example was not used until later, when the State questioned the venire about their ability to follow the law on a felony murder involving accomplice liability. It is proper to ask venirepersons questions to determine whether they have any preconceived notions about the law which would impede their ability to follow instructions submitting felony murder or accomplice liability. *See State v. Ramsey*, 864 S.W.2d 320, 335–36 (Mo. banc 1993); *State v. Henderson*, 750 S.W.2d 555, 557

---

7. Defendant contends that the inclusion of a specific objection in her motion for new trial was sufficient to preserve the matter. We disagree. In order to preserve a point for appellate review, the point raised on appeal must be based upon the theory of the objection as made at the trial and as preserved in the motion for new trial. *State v. Ball*, 622 S.W.2d 285, 290–91 (Mo.App.1981). Nothing is preserved for appellate review when the assignments of error in a motion for new trial and on appeal are enlargements of a general objection made at the time of trial. *State v. Snow*, 558 S.W.2d 414, 416 (Mo.App.1977); *State v. Harper*, 553 S.W.2d 895, 898 (Mo. App.1977); *State v. Blankenship*, 536 S.W.2d 520, 521 (Mo.App.1976).

(Mo.App.1988). The use of hypotheticals for this purpose also is permissible. *State v. Seddens,* 878 S.W.2d 89, 91–92 (Mo.App. 1994). The control of *voir dire* is a matter within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. *State v. Rulon,* 935 S.W.2d 723, 725 (Mo.App.1996). We find no abuse of discretion here.

■ Second, we do not believe the use of this bank robbery example caused any confusion among the venirepersons concerning the elements necessary to convict someone of first degree murder. The prosecutor's example was used as part of her discussion of the concepts of felony murder and accomplice liability. That point was reinforced during Defendant's *voir dire* examination. Defense counsel revisited these topics and specifically reminded the venire that the prosecutor had been talking about the concept of *felony murder* when she used the bank robbery example:

> BY MR. PERRY:.... Now, Miss Stemmons talked to you about a couple of things, one of which is felony murder. And she talked to you—a number of you indicated to her that you had a little problem with that.
>
> ....
>
> VENIREMAN BROWN: Please refresh our memory on exactly which the felony murder was.
>
> ....
>
> BY MR. PERRY: Okay. You understand the Prosecutor talked to you about the felony murder rule and I think she gave the illustration of the bank robbery. That's what I'm talking about. That discussion regarding the bank robbery....

Defense counsel was also careful to point out that the bank robbery example used by the prosecutor was hypothetical in nature and that the jury would have to be guided by any later instructions the trial court gave on felony murder:

> BY MR. PERRY: Okay. What if I told you that this isn't a bank robbery case? And the facts of this case isn't going to be anything like the illustration given by [Ms.] Stemmons; would that change your opinion?
>
> VENIREMAN BROWN: I still—it would depend upon the circumstances as to exactly whether I could follow the instructions of the Judge or not. If they were against what I firmly believe; I could not.
>
> ....
>
> BY MR. PERRY: Now, you understand that nobody even knows if the Judge is going to so instruct the jury; right?
>
> VENIREMAN BROWN: Yes.
>
> BY MR. PERRY: That's a decision the Judge will make at a later date. Would you do the best you could to follow the Court's instructions?
>
> VENIREMAN BROWN: Yes, I would.
>
> ....
>
> BY MR. PERRY: Anybody else that has any concern that they could follow the Court's instructions, should this jury be instructed on felony murder? (No hands raised.)

In light of defense counsel's substantial additional discussion of this issue, we do not believe the venire was misled into thinking that the bank robbery example dealt with first degree murder at all.

Third, when the case was submitted, the jurors received instructions on first degree murder, second degree murder—conventional, second degree murder—felony, voluntary manslaughter, involuntary manslaughter and kidnapping. Each of these instructions also contained a paragraph concerning accomplice liability. Defendant does not contend that any of these instruc-

tions incorrectly stated the law. The jury is presumed to have followed these instructions in deciding the issue of Defendant's guilt or innocence. *State v. Madison*, 997 S.W.2d 16, 21 (Mo. banc 1999). Defendant's fifth point is denied.

Having given careful consideration to each of Defendant's points, we find that the trial court did not err for any of the reasons asserted in her appeal. Therefore, the trial court's judgment is affirmed.

SHRUM, J., and RAHMEYER, C.J.– P.J., concur.