**STATE of Missouri, Plaintiff–Respondent,**

v.

**Richard R. PLACKE, Defendant–Appellant.**

**No. SD 29207.**

Missouri Court of Appeals, Southern District, Division One.

Aug. 5, 2009.

Kent Denzel of Columbia, MO, for Appellant.

Chris Koster, Atty. Gen., James B. Farnsworth, Asst. Atty. Gen. of Jefferson City, MO, for Respondent.

JEFFREY W. BATES, Judge.

Richard Placke (Defendant) was convicted by a jury of committing the crimes of statutory sodomy (Count I) and attempted statutory rape (Count II). The jurors recommended sentences of seven and ten years for these offenses, respectively. At the sentencing hearing, however, the trial court imposed a ten-year sentence for the statutory sodomy conviction and a seven-year sentence for the attempted statutory rape conviction.

Defendant presents three points of error on appeal. The first two deal with the admission of evidence at trial and have no merit. In the third point, Defendant contends the trial court plainly erred in imposing a sentence for the statutory rape conviction that exceeded the jury's recommendation. This Court agrees. Because it appears from the record that the trial court committed a plain error which affected the sentence imposed for each conviction, both sentences are vacated. The cause is remanded so the trial court can sentence Defendant again on Counts I and II. In all other respects, the judgment is affirmed.

## I. Factual and Procedural Background

Defendant was charged by information with committing the unclassified felonies of

statutory sodomy in the first degree and attempted rape in the first degree. *See* §§ 566.062, 566.032.[1] The information alleged that B.K., a minor less than 14 years old, was the victim of these crimes. The events serving as the basis for Count I allegedly occurred in May 2005, and the events serving as the basis for Count II allegedly occurred in July 2006. Following a jury trial, Defendant was convicted on both counts.

Defendant does not challenge the sufficiency of the evidence to sustain his convictions. On appeal, this Court considers the facts and all reasonable inferences derived therefrom in a light most favorable to the verdict, and rejects all contrary evidence and inferences. *State v. Newberry,* 157 S.W.3d 387, 390 (Mo.App.2005); *State v. Cravens,* 132 S.W.3d 919, 921 (Mo. App.2004). Viewed from that perspective, the favorable evidence supporting the State's case against Defendant is summarized below.

B.K. was born in September 1993. In 2002, she began living with her grandmother, D.B. (Grandmother). At that time, B.K. was nine years old. In 2003, Grandmother became B.K.'s legal guardian.[2] In 2005, Grandmother and B.K. lived with Grandmother's other daughter, J.D. (Aunt). Her daughter, T.D., was approximately four years younger than B.K. The two young girls were good friends and were more like "sisters rather than cousins." Defendant was Aunt's live-in boyfriend. In August 2005, Grandmother and B.K. moved to another home in the area, but the families continued to socialize and gather for meals. B.K. and T.D. continued to be good friends and saw each other often.

In February 2007, B.K. told an adult that she and T.D. had been sexually abused by Defendant. The adult, who was a close friend to Grandmother, told her what B.K. had said. Grandmother called Aunt and said that B.K. was making allegations against Defendant and that it also involved T.D. Grandmother did not disclose any other details to Aunt at that time. Grandmother then called B.K.'s counselor, Larry Wright (Wright). B.K. had begun seeing Wright when she started living with Grandmother in 2002. B.K. had seen Wright at least once a week since that time. When Grandmother called Wright, he was told in general terms that B.K. was making allegations against someone and that she would not talk to Grandmother about it. Approximately two weeks later, Grandmother met with B.K. and Wright in his office. When Wright asked B.K. to tell them what was going on, she started crying and telling them that Defendant "had been touching her private parts."

Grandmother then called Aunt again. This time, Grandmother told Aunt about B.K.'s allegations against Defendant and that they needed to talk. While Aunt was on the phone, she called to T.D. and asked her if Defendant had ever touched her private area. T.D. answered that Defendant did, and that he also exposed himself to her. Aunt, T.D. and Defendant went to Grandmother's house and met in her living room. B.K. was in her room. When Grandmother asked Defendant if he knew what had been happening, he indicated "no" by shaking his head. Aunt said she had not discussed the subject with him. Grandmother told Defendant that B.K.

---

1. All references to statutes are to RSMo (2000) unless otherwise specified. All references to rules are to Missouri Court Rules (2009).

2. B.K.'s mother, who was Grandmother's daughter, and B.K.'s father were both in prison.

had accused Defendant of touching her and T.D. Grandmother asked T.D. if Defendant had been touching her privates, and T.D. said "yes." Grandmother told Defendant that a hot-line call had been made, and he probably would be arrested. Defendant initially said nothing. When B.K. walked into the room, Defendant said, "Well, I guess my life's over now. The cat's out of the bag." He became angry and started cursing as he made his way out of the house. Aunt yelled to B.K. that she should never call T.D. again or come to their house. As Aunt left, she expressed her hatred of B.K.

A few days later, B.K. was interviewed at her house by Dana Maxwell (Maxwell) of the Children's Division. Thereafter, B.K. was interviewed at the Child Advocacy Center (CAC) in Doniphan, Missouri, by CAC forensic interviewer Clea Fairaizl (Fairaizl). B.K.'s CAC interview was videotaped. T.D. was similarly contacted and interviewed first by Maxwell, and then by Fairaizl. T.D.'s CAC interview also was videotaped. A few days after B.K.'s CAC interview, she underwent a SAFE examination in Poplar Bluff, Missouri, performed by Dr. Dorothy Munch (Dr. Munch).

In March 2007, Defendant was charged with statutory sodomy and attempted statutory rape of B.K. At an April 2008 pretrial conference, defense counsel informed the trial court of his intention to call both Aunt and T.D. as witnesses for the defense.

A jury trial was held in April 2008. During opening statement, defense counsel told the jury that T.D. "is going to tell you that all this is made-up. [T.D.] is going to tell you why all of this is made-up." Grandmother, Dr. Munch and B.K. were the witnesses who testified during the State's case-in-chief. The following is a summary of B.K.'s direct examination testimony about how she had been sexually abused by Defendant.

In the spring of 2005, B.K. was 11 years old. Defendant took B.K. and T.D. outside one night to look at shooting stars. The three of them lied down on a blanket in the pasture beside their house. Defendant was lying between the two girls. Defendant slid his hand into B.K.'s shorts and began rubbing her vagina. He pressed his finger far enough inside that it was painful. B.K. jumped up and went inside. Later that night, B.K. talked to T.D. about what had happened. T.D. asked whether Defendant had been rubbing between B.K.'s legs. When B.K. said "yes," T.D. confided that Defendant also had been doing that to her.

On another occasion, B.K.'s family and Defendant were planning to go camping at a lake. As they prepared for the trip, B.K. followed Defendant into the barn where they stored supplies. Defendant stood in front of B.K. and told her to close her eyes. Defendant tried to put his penis in B.K.'s mouth, but he only made contact with her cheek instead. Afterwards, B.K. had to wipe Defendant's semen off the side of her face. When the group arrived at the lake, Defendant took B.K. and T.D. out in his boat to go swimming. He drove the boat to the middle of the lake and dropped anchor far enough from shore that no one could see what they were doing. While Defendant and B.K. were in the water, Defendant stuck his hand inside B.K.'s bathing suit and inserted his finger into her vagina. T.D. was out of sight on the other side of the boat.

Defendant's sexual contact with B.K. continued after the family returned home. B.K. and Defendant were sitting on the couch one evening watching television when he draped a blanket over B.K. and himself. Beneath the blanket, Defendant reached inside B.K.'s shorts and under-

wear and started rubbing her vagina. He put his finger inside her vagina. B.K. stood up, told Defendant to leave her alone and went to her bedroom. Thereafter, B.K. was left alone in the house with Defendant. Defendant was lying in bed when he called to B.K. to bring him a glass of water. As B.K. set the glass down on a bedside table, Defendant grabbed her and threw her onto the bed. He pulled her shorts and underwear off and then lowered his jeans, exposing his penis. He tried to put his penis into B.K.'s vagina, but he was unsuccessful. Eventually, he let B.K. go. On another occasion, B.K. and T.D. were swimming in the family pool with Defendant. The girls were wearing diving goggles. As they swam toward Defendant, he pulled his shorts aside to show them his penis. Later, B.K. talked to T.D. about the incident, and they agreed that Defendant's penis was "nasty and ugly."

B.K.'s last encounter with Defendant took place on July 4, 2006. B.K. and T.D. helped Defendant and Aunt clean the pool. Aunt went inside to take a shower. B.K., T.D. and Defendant got into the pool. The three of them were "playing around" when Defendant grabbed B.K.'s legs and pulled her toward him. Defendant stripped off B.K.'s bikini bottom and removed his shorts. He then spread B.K.'s legs open and tried to insert his penis into B.K.'s vagina. He failed to penetrate her. B.K. kicked Defendant and retrieved her swimsuit. She said she would tell on Defendant if he touched her or T.D. again.

Following B.K.'s testimony on direct, she was extensively cross-examined by defense counsel. After B.K. testified, the State rested. During Defendant's case-in-chief, his attorney called Aunt and T.D. as witnesses. Aunt testified that she loved Defendant and had been involved with him for seven years. On cross-examination, Aunt admitted that she knew T.D. had complained about sexual contact by Defendant. Aunt also admitted that she received social security benefits for T.D. If she were removed from the household, Aunt's income would be reduced.

T.D. was the next witness called. She was in the fifth grade as of the date of trial. T.D. was crying before she began to testify. When defense counsel asked why, T.D. said she was crying because she knew that what she had done was wrong. Defense counsel asked, "[w]hat did you do that you think is wrong?" T.D. replied that she had said Defendant "did all these things and he really didn't." When asked what things she was talking about, T.D. answered, "[l]ike raping me and [B.K.] and stuff like that." According to T.D., she made allegations against Defendant because B.K. said she would no longer be T.D.'s friend or talk to her anymore if she did not do so. T.D. also claimed to be afraid of B.K. because she had threatened to hit T.D. According to T.D., B.K. was mad at Defendant. Both B.K. and T.D. helped Defendant recycle scrap metal, but Defendant only paid T.D. for her work. T.D. testified that B.K. said she was going to "get [Defendant] paid back," and told T.D. to say that Defendant had sexually abused her. T.D. said she remembered the day when everyone had gathered at Grandmother's house, and she admitted that she had told Grandmother "something that night."

On cross-examination, T.D. testified that she recalled talking to Fairaizl at the CAC. T.D. acknowledged that she had been asked to tell the truth and informed that it was important to tell the truth. After receiving those instructions, T.D. said that Defendant had touched her sexually and exposed his private parts to her. Nevertheless, T.D. claimed at trial that the things she told Fairaizl were lies.

The State then requested to play T.D.'s CAC interview to impeach her testimony that B.K. had compelled T.D. to fabricate all the allegations of abuse. The court ruled that the video was admissible, but further foundation was necessary. After the defense rested, the State called Fairaizl as a rebuttal witness. Fairaizl testified that, during the videotaped CAC interview, T.D. disclosed multiple incidents of sexual assault perpetrated by Defendant. The State again requested to play T.D.'s videotaped CAC interview for the jury. Defendant objected, arguing that the tape was improper impeachment because T.D. had admitted making the prior statement. According to Defendant, there was no inconsistency to highlight by playing the videotape. Defense counsel also asserted that, if the tape were played, he would need to call Maxwell as a witness. The prosecutor argued that the whole videotape was inconsistent with T.D.'s trial testimony. The court overruled Defendant's objection and permitted the State to play the videotaped interview. During the interview, T.D. stated that Defendant had sexually abused her numerous times by sticking his fingers down her pants, showing her his "private spot," and pushing his "private part" in between her legs and moving "back and forth."

In surrebuttal, Defendant called Maxwell. She had interviewed T.D. and witnessed the forensic interview between T.D. and Fairaizl. Maxwell testified that T.D. said that Defendant had touched her as often as once a day; Defendant "poked his penis in between her vagina and bottom hole"; and he "pushed his private against her, but it did not go in." The State did not ask Maxwell any questions.

After the jury found Defendant guilty of first-degree statutory sodomy under Count I and first-degree attempted rape under Count II, the jurors heard additional evidence from Defendant on the issue of sentencing. The jury recommended a seven-year sentence on Count I and a ten-year sentence on Count II. At the subsequent sentencing hearing, however, the trial court imposed concurrent sentences of ten years on Count I and seven years on Count II. This appeal followed. Additional facts necessary to the disposition of this appeal will be set out below as we address Defendant's three points of error.

## II. Discussion and Decision

### Point I

In Defendant's first point, he contends the trial court erred in admitting testimony that Defendant had sexually abused T.D. Defendant argues the following testimony should not have been admitted:

1. Grandmother's testimony that T.D. said Defendant had touched her private area and exposed himself.
2. B.K.'s testimony that T.D. said Defendant was rubbing between her legs while the trio was stargazing.
3. Aunt's testimony that T.D. had complained of sexual contact by Defendant.
4. Fairaizl's testimony that T.D. had disclosed multiple incidents of sexual assault perpetrated by Defendant.
5. T.D.'s entire videotaped CAC interview.

Defendant objected to item 1 as hearsay and to item 5 as improper impeachment. These same objections were carried forward in the motion for new trial and have been raised as a part of Defendant's first point. Accordingly, Defendant properly preserved these objections for appellate review. *State v. Lloyd*, 205 S.W.3d 893, 900 n. 5 (Mo.App.2006); *State v. Cummings*, 134 S.W.3d 94, 108 n. 7 (Mo.App. 2004). Defendant did not make any objections to items 2–4, and he seeks to raise

new objections to items 1 and 5 that were not presented below. These challenges have not been preserved for appellate review. *Lloyd,* 205 S.W.3d at 900 n. 5; *Cummings,* 134 S.W.3d at 108 n. 7.

 This Court reviews preserved errors relating to the admission of evidence for abuse of discretion. *Cummings,* 134 S.W.3d at 102. A trial court has broad discretion in determining the admissibility of evidence. *State v. Churchill,* 98 S.W.3d 536, 538 (Mo. banc 2003). "A decision to admit evidence constitutes an abuse of discretion only when it is clearly against the logic of the circumstances then before the trial court and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration." *Cummings,* 134 S.W.3d at 102. In addition, this Court reviews rulings involving the admission of evidence for prejudice, rather than mere error. *State v. Bisher,* 255 S.W.3d 29, 33 (Mo.App.2008). Reversal is required only if the error more likely than not affected the outcome of the case. *State v. Walkup,* 220 S.W.3d 748, 757 (Mo. banc 2007).

 Defendant has requested plain error review of his unpreserved challenges to the above-mentioned evidence. Rule 30.20 provides that "plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." *Id.* "Plain errors are evident, obvious, and clear, and we determine whether such errors exist based on the facts and circumstances of each case." *State v. Johnson,* 182 S.W.3d 667, 670 (Mo.App.2005). Defendant bears the burden of establishing that the trial court committed an evident, obvious and clear error. *State v. Thurman,* 272 S.W.3d 489, 498 (Mo.App.2008). Defendant also bears the burden of proving the existence of a manifest injustice or a miscarriage of justice. *State v. Stanley,* 124 S.W.3d 70, 77 (Mo.App.2004). "A claim of plain error places a much greater burden on a defendant than an assertion of prejudicial error." *State v. Wright,* 216 S.W.3d 196, 199 (Mo.App.2007). "Plain error and prejudicial error are not synonymous terms, and mere allegations of error and prejudice will not suffice for reversal under plain error review." *Id.* Plain error can serve as the basis for granting relief on direct appeal only if the error was outcome determinative. *State v. Baxter,* 204 S.W.3d 650, 652 (Mo. banc 2006).

 With this prologue completed, we turn to the first argument presented by Defendant's point. He contends the trial court committed plain error in admitting items 1–5 in evidence because all of this testimony constituted improper evidence of uncharged crimes. Evidence of prior uncharged misconduct is generally inadmissible for the purpose of showing the propensity of the defendant to commit such crimes. *State v. Bernard,* 849 S.W.2d 10, 13 (Mo. banc 1993). Defendant argues the admission of the challenged evidence was so prejudicial that it resulted in a manifest injustice or miscarriage of justice. This Court disagrees. At trial, Defendant presented evidence of alleged sexual abuse of T.D. by himself during his case-in-chief. Defense counsel intentionally did so for the strategic purpose of attempting to show that the allegations made by B.K. and T.D. were lies. For example, during T.D.'s direct examination, defense counsel elicited testimony from her that she had said Defendant raped her. During surrebuttal, defense counsel also called Maxwell, who testified on direct examination that T.D. said Defendant had touched her as often as once a day. In addition, Maxwell testified that T.D. said Defendant "poked his penis in between her vagina and bottom hole," and that he "pushed his private

against her, but it did not go in." Defendant could not have been prejudiced by the admission of items 1–5 when he elicited the same type of testimony from his own witnesses. *State v. Turner*, 242 S.W.3d 770, 779 (Mo.App.2008). "A defendant cannot be prejudiced by admission of objectionable evidence if he offers similar evidence." *State v. Holmes*, 978 S.W.2d 440, 442 (Mo. App.1998). Defendant cannot seek plain error review arising from failed tactical and strategic decisions made at trial. *Turner*, 242 S.W.3d at 779. Defendant attempts to avoid the consequences of his actions by asserting that T.D. and Maxwell would not have testified at trial "if the State had not brought in the improper hearsay and propensity evidence in the first place." That assertion is contradicted by the transcript. Defense counsel stated at the April 2008 pre-trial conference that he planned to call Aunt and T.D. as witnesses. In opening statement, defense counsel told the jury he would present evidence that B.K. and T.D. made up their allegations against Defendant. Counsel said T.D. was going to testify to that effect and explain why these allegedly false allegations had been made. T.D. did exactly that during her direct examination by defense counsel. Defendant's first argument has no merit.

 In Defendant's second argument, he argues that the trial court abused its discretion by admitting item 1, Grandmother's testimony that T.D. said Defendant had touched her private area and exposed himself.[3] "[A] conviction will not be reversed for improper admission of hearsay that was not prejudicial to the accused." *State v. McFarland*, 259 S.W.3d 621, 624 (Mo.App.2008). Defendant was

not prejudiced by Grandmother's testimony because similar testimony was elicited from B.K., T.D. and Maxwell. *See Bryan v. State*, 134 S.W.3d 795, 800–01 (Mo.App. 2004) (complaining party cannot be prejudiced by the introduction of challenged hearsay evidence when that evidence is merely cumulative to other admitted evidence of like tenor); *State v. Winegarner*, 87 S.W.3d 923, 925 (Mo.App.2002) (same holding). Defendant's second argument has no merit.

 In Defendant's third argument, he contends the trial court abused its discretion in admitting T.D.'s videotaped CAC interview because it was improper impeachment evidence. Section 491.074 states that "a prior inconsistent statement of any witness testifying in the trial of a criminal offense shall be received as substantive evidence, and the party offering the prior inconsistent statement may argue the truth of such statement." *Id.* "Inconsistent statements are available as substantive evidence, and may be used just as soon as the inconsistency appears from the testimony. The only necessary foundation is the inquiry as to whether the witness made the statement, and whether the statement is true." *State v. Bowman*, 741 S.W.2d 10, 14 (Mo. banc 1987) (footnote omitted). The prior inconsistent statement is admissible regardless of the witness' answer as to its verity. *State v. Lyons*, 951 S.W.2d 584, 594 (Mo. banc 1997). "Whether an inconsistency exists between trial testimony and statements made prior to trial is to be determined by the whole impression and effect of what has been said and done." *State v. Blankenship*, 830 S.W.2d 1, 9 (Mo. banc 1992).

---

3. Defendant also seeks plain error review of other statements by T.D. that Defendant claims were hearsay. This Court declines to engage in further plain error review in this regard. Because Defendant offered similar evidence, he failed to establish any prejudice in admitting the statements and is entitled to no relief.

Defendant argues that T.D.'s CAC interview was not admissible because she admitted at trial that she made the statements recorded on the videotape, but claimed she had been lying during the interview. According to Defendant, T.D.'s denial of the truth of the statements removed any inconsistency between her trial testimony and what she said on the videotape and rendered the videotape inadmissible. That argument is patently absurd. T.D.'s videotaped CAC interview contained numerous statements detailing specific sexual abuse by Defendant. At trial, T.D. testified that all of the accusations of sexual abuse she had made against Defendant were false and had been coerced by threats from B.K. Therefore, the whole impression and effect of what had been said and done at trial demonstrated a stark inconsistency between T.D.'s trial testimony and the prior inconsistent statements contained in the videotape. T.D.'s admission that she made the statements in the videotape, but denied their truth, did not affect the videotape's admissibility. *Lyons*, 951 S.W.2d at 594; *Bowman*, 741 S.W.2d at 11–12; *State v. McClanahan*, 202 S.W.3d 64, 69–71 (Mo.App.2006). Thus, the trial court did not abuse its discretion in allowing the jury to view the videotape.

Our conclusion is amply supported by *Bowman*, upon which Defendant relies. In *Bowman*, witness Lytle gave a videotaped statement to the police stating that he heard cries of protest by the victims and the sounds of pain and that he saw the defendant stab one of the victims. At trial, Lytle admitted having made these statements, but he said they were not true. Lytle claimed he made these statements because the police had mistreated him. *Bowman*, 741 S.W.2d at 12. The trial court admitted the videotape into evidence and permitted the jury to see it. *Id.* at 14. On appeal, our Supreme Court held that

Lytle's prior inconsistent statements were admissible pursuant to § 491.074 as substantive evidence against the defendant even though Lytle had disavowed the prior statements under oath. *Bowman*, 741 S.W.2d at 12. The trial court's decision to allow the jury to view the videotape also was upheld. "Inasmuch as the statement constitutes substantive evidence, the jury should have it in the best form for judging its credibility. Lytle, furthermore, claimed that he had been pressured and abused by the interrogating officer, and the tape better enabled the jury to resolve this claim." *Id.* at 14. Just as in *Bowman*, the admission of T.D.'s videotaped CAC interview in the case at bar helped the jury determine whether her trial testimony or her videotaped statement was the truth. By viewing the videotape, the jury was better able to resolve T.D.'s contention that the accusations in the interview had been prompted by threats from B.K. *See State v. Irby*, 254 S.W.3d 181, 190 (Mo.App.2008); *State v. Neely*, 979 S.W.2d 552, 560 (Mo.App.1998). Defendant's third argument has no merit, and Point I is denied.

*Point II*

In Defendant's second point, he contends the trial court abused its discretion in admitting B.K.'s statement to Grandmother that Defendant "had been touching her private parts." Prior to trial, the prosecutor filed a notice of the State's intention to use B.K.'s statements to certain individuals, including Grandmother, pursuant to § 491.075 RSMo Cum.Supp. (2007). On the first day of trial, the court found that B.K.'s statements to some of those individuals were admissible, but the court did not make any findings with regard to the admissibility of B.K.'s statements to Grandmother. At trial, Defendant's hearsay objection to Grandmother's

testimony concerning B.K.'s statements was overruled. On appeal, Defendant argues that the trial court committed reversible error because there were insufficient indicia of reliability necessary to admit the statement.

■ As previously noted, "a conviction will not be reversed for improper admission of hearsay that was not prejudicial to the accused." *State v. McFarland,* 259 S.W.3d 621, 624 (Mo.App.2008). In addition, "[p]rejudice will not be found from the admission of hearsay testimony where the declarant was also a witness at trial, testified on the same matter, and was subject to cross-examination." *State v. Hamilton,* 892 S.W.2d 371, 378 (Mo.App.1995); *Elliott v. State,* 272 S.W.3d 924, 926 (Mo. App.2009). When the declarant is available for live testimony under oath, the dangers of hearsay are largely non-existent. *State v. Link,* 25 S.W.3d 136, 145 (Mo. banc 2000); *State v. Lebbing,* 114 S.W.3d 877, 880 (Mo.App.2003). Here B.K. testified during her direct examination about Defendant touching her private parts, and she was subjected to thorough cross-examination by defense counsel. Under these circumstances, the admission of this single hearsay statement during Grandmother's testimony could not have been prejudicial to Defendant. *See Link,* 25 S.W.3d at 145–46. Defendant's second point is denied.

### Point III

In Defendant's third point, he contends the trial court plainly erred in sentencing him to ten years imprisonment on Count I when the jury recommended a seven-year sentence. At trial, the jury recommended sentences of seven years on Count I and ten years on Count II. At the sentencing hearing, however, the trial court obviously transposed those recommendations because the judge stated that "[t]he jury entered its recommended sentence in each of those two [counts], that being ten years on Count I and seven years on Count II." No one corrected the court's misstatement. The court entered sentences on each count based on that mistaken recitation of what the jury had recommended. Thus, it is obvious from the record before this Court that: (1) the court intended to sentence Defendant on each count in accordance with the jury's recommendations; but (2) both sentences were imposed based upon a mistaken belief by the judge as to what the jury had recommended on each count.

■ Defendant contends the trial court committed plain error by sentencing him to a term greater than the jury recommended for Count I in violation of § 557.036.5 RSMo Cum.Supp. (2007). This subsection states:

> If the jury returns a verdict of guilty in the first stage and declares a term of imprisonment in the second stage, the court shall proceed as provided in subsection 1 of this section except that any term of imprisonment imposed cannot exceed the term declared by the jury unless the term declared by the jury is less than the authorized lowest term for the offense, in which event the court cannot impose a term of imprisonment greater than the lowest term provided for the offense.

*Id.* The lowest term for each offense was five years. *See* §§ 566.062, 566.032. The trial court committed an evident, obvious and clear error in sentencing Defendant to serve 10 years on Count I because that exceeded the jury's recommendation. *See* § 557.036.5 RSMo Cum.Supp. (2007); *State v. Washington,* 200 S.W.3d 83 (Mo. App.2006) (plain error in sentencing defendant to a term greater than that recommended by jury in violation of § 557.036.5; case remanded for resentencing).

■ Defendant requests this Court to only vacate the sentence on Count I and limit the remand to resentencing on that count alone. This we cannot do. Defendant has established that the trial court committed plain error during sentencing. That error affected both of the sentences imposed by the court. *See State v. Minton*, 782 S.W.2d 134, 135 n. 1 (Mo.App. 1989). Under these particular circumstances, plain error relief requires that the case be remanded for resentencing on both counts.

Defendant's third point is granted. Defendant's sentences are vacated, and the cause is remanded for resentencing on Counts I and II. In all other respects, the judgment of the trial court is affirmed.

BARNEY, J. and SCOTT, P.J., Concur.