**STATE of Missouri, Plaintiff–Respondent,**

v.

**Joseph J. SAVICK, Defendant–Appellant.**

**No. SD 30215.**

Missouri Court of Appeals, Southern District, Division One.

Aug. 18, 2011.

Matthew Ward, Columbia, MO, for Appellant.

Chris Koster, Attorney General, and Daniel N. McPherson, Asst. Attorney General, Jefferson City, MO, for Respondent.

GARY W. LYNCH, Judge.

Joseph J. Savick ("Defendant") was convicted of the class D felonies of driving while revoked (section 302.321, RSMo Cum.Supp.2005) and resisting arrest (section 575.150, RSMo Cum.Supp.2005), the class C felony of assault on a law enforcement officer (section 565.082, RSMo Cum. Supp.2005), and the class B felony of driving while intoxicated (section 577.010, RSMo 2000). The charges stemmed from Defendant's refusal to stop when law enforcement attempted to pull him over for a license violation and a subsequent pursuit that ensued before he was apprehended. Defendant appeals only his conviction for driving while intoxicated, contending that the trial court abused its discretion in allowing an officer to testify that he believed Defendant was under the influence of a central nervous system stimulant, based upon a drug recognition evaluation, without establishing the necessary foundation for admission of expert testimony. Assuming, without so finding, that the evidence was erroneously admitted, we find, nevertheless, that its admission did not prejudice Defendant and therefore affirm the trial court's judgment.

### *Factual and Procedural Background*

Viewed in the light most favorable to the trial court's verdict, *State v. Hall,* 201 S.W.3d 599, 601 (Mo.App.2006), the following facts were adduced. On the night of

September 28, 2006, Sergeant Jeremy Lynn of the Greene County Sheriff's Department was in his patrol vehicle waiting to turn northbound onto state highway 13 from eastbound Kearney Street. Defendant was driving a tan Plymouth Sundance and was waiting to turn in front of Lynn. Defendant caught Lynn's attention by frequently turning around to look back at him and watching him in the rearview mirror. When Lynn ran a check of Defendant's license plate number, he discovered it had actually expired in 2004; the physical plate indicated an expiration date of 2007. When the traffic signal turned green and both vehicles turned, Lynn activated his lights and siren to signal Defendant to pull over. Defendant did not stop and continued northbound on highway 13 while Lynn followed for two or three blocks. Lynn advised dispatch he was following a vehicle that had failed to yield, turned off his siren and lights, and continued to follow Defendant from a distance in order to monitor Defendant's actions.

Deputy Andrew Long of the Greene County Sheriff's Department received Lynn's radio call while he was in a position north of Lynn at the intersection of Farm Road 94 and highway 13. When Defendant's vehicle passed his position, Long turned onto highway 13, and both officers continued to follow Defendant, who sporadically changed lanes as he proceeded northbound. On his approach to the intersection of state highway O, Defendant abruptly swerved his vehicle from the passing lane into the right lane without signaling and turned right at the intersection, cutting off a black pickup truck that had been in the right lane alongside Defendant and causing it to "[skid] off the road and into the ditch line." Both officers activated their vehicles' lights and sirens and pursued Defendant as he drove at excessive speeds eastbound on highway O. A video camera in Long's vehicle recorded the pursuit.

Defendant drove in both lanes of the road and turned southbound onto Farm Road 141 without stopping at a stop sign. Lynn estimated Defendant's speed at 60 to 70 miles per hour. The officers followed Defendant as he turned and proceeded eastbound on Farm Road 76. Along that road, a maroon Cadillac had stalled and was blocking both lanes of the road. Defendant drove around the stalled car, driving through the ditch, and continued eastbound. At this point, Long estimated Defendant's speed around 70 miles per hour. As they approached a "T" intersection at Farm Road 145, Lynn ordered Long to "back way off" and give Defendant "plenty of room" so Defendant would not do "anything irrational." Long complied. Defendant ran another stop sign when he reached that intersection, where he turned and headed northbound. Defendant continued swerving in both lanes northbound along Farm Road 145, driving some 70 to 80 miles per hour and running another stop sign at state highway WW. At Farm Road 56, Defendant turned west and proceeded at a high rate of speed toward highway 13. At that point, highway 13 is a four-lane divided highway, with two northbound lanes and two southbound lanes. Lynn could see headlights of vehicles traversing the highway intersection ahead, and he again directed Long to back off as Defendant approached the traffic-congested highway at speeds of 85 or 90 miles per hour. Running yet another stop sign, Defendant turned south onto highway 13, missing a southbound semi-truck by a few inches and a northbound truck by just a few feet. Lynn and Long slowed and turned at the intersection, following at a greater distance behind Defendant as he headed southbound on highway 13.

At this point, several additional officers were converging on the area in an attempt to assist Lynn and Long. Greene County Corporal Dennis Ewing attempted to get ahead of Defendant's car near the intersection of highways 13 and WW to deploy spike strips in order to deflate Defendant's tires and stop his vehicle. Ewing positioned his vehicle in the median of the highway just north of the intersection and waited for Defendant. Lynn observed Defendant drive through the median toward Ewing. Ewing drew his weapon as Defendant passed within approximately ten feet of him and proceeded southbound in the northbound lanes of highway 13 against oncoming traffic. As Defendant continued southbound, he turned off his headlights and drove around the vehicle in front of him. Lynn estimated Defendant's speed at 90 miles per hour at this point in the pursuit. Lynn backed off to call his lieutenant to advise of the pursuit and directed another officer to stop northbound traffic at Norton Road and highway 13 to avoid a head-on collision. Corporal Russell Donaldson took over in a secondary position while Long remained in the primary position behind Defendant.

Defendant turned east off highway 13 onto highway WW, continued to highway H, where he turned south, and turned again on Shelby Road and wound his way to U.S. Highway 65, all the while with officers in pursuit. At highway 65, Corporal Lynn had stopped southbound traffic to avoid any potential collision with Defendant and the pursuing officers as their vehicles entered the highway.

Various law enforcement agencies responded during the 41–mile pursuit that lasted some 42 minutes, and several attempts were made by officers along the route to deploy spike strips in order to slow or stop Defendant's flight. Spike strips placed to the west of highway 65 punctured three of the tires on Defendant's vehicle, but he continued driving, turning southward onto northbound highway 65 and proceeding south in the northbound lane and along the asphalt shoulder of the highway. At the point Defendant entered the roadway, highway 65 is a two-lane highway, but it splits into a four-lane, divided highway near the Springfield city limits. Officers had blocked traffic at accesses along highway 65 and eastward at the access to Interstate 44 and had Defendant "boxed in" as he neared the Chestnut Expressway exit.

As Defendant attempted to again drive across the median, his speed slowed, and Defendant opened the driver's side door several times as he attempted to jump out of the vehicle while it was still moving. His front left and both rear tires were shredded off, and he was driving on the rims, which prevented him from gaining any traction. The vehicle became stuck in the median. Defendant exited his vehicle, jumped onto the hood of a patrol car, and began running eastbound as officers ordered him to stop and pursued him on foot. Law enforcement officers stopped Defendant on an embankment on the other side of the highway and ordered him to lie facedown on the ground with his hands behind him, which Defendant refused to do. Instead, Defendant kept his hands underneath his body, which prevented officers from being able to handcuff him. One officer used his taser on Defendant, and when one of the taser's prongs did not connect, he used the taser as a stun gun on the back of Defendant's neck as Defendant continued to fight and resist.

Defendant was eventually arrested and advised of his *Miranda*[1] rights, after which Defendant agreed to speak with Deputy

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Long. When Long asked Defendant "what was going on today[,]" Defendant responded "that he didn't know and that he thought he was just in a fight with somebody." Long observed that Defendant's eyes were "glassy and bloodshot, [that] he was staring straight ahead, like a hard stare[,]" and that he was sweating profusely. Long transported Defendant to the Greene County Jail. Although he did not smell intoxicants, Long believed that Defendant was impaired based upon Defendant's abnormal behavior and requested that Defendant submit to field sobriety testing.

Long first conducted a horizontal gaze nystagmus ("HGN") evaluation, in which Long instructed Defendant to stand with his feet together and arms at his side as Long held his finger up in front of Defendant's face slightly above his eyebrows and told Defendant to follow his finger with his eyes only and without moving his head. Long was checking for a smooth pursuit as Defendant's eyes tracked from one side to the other. Both of Defendant's eyes "jerked" and "bounced a little bit[ ]" as they followed Long's finger. As Long observed distinct nystagmus in both eyes and the "onset of nystagmus prior to 45 degrees," Defendant swayed back and forth and was unable to stand completely still. Long opined that Defendant "was possibly impaired."

After inquiring whether Defendant had any physical issues with his legs that would hinder walking, standing, or operating a vehicle, to which Defendant answered that he did not, Long administered a walk-and-turn test. Long instructed Defendant to place his right foot directly in front of his left foot, touching heel to toe with his arms down at his side, while Long provided further directions; Long demonstrated this maneuver as he described it. He told Defendant not to begin until he

was instructed to do so and then "take nine heel-to-toe steps" forward in a straight line and turn "and then take nine heel-to-toe steps back." Defendant failed to maintain his initial position until told to begin, used his arms for balance, took eleven steps instead of nine, and "had to stop and steady himself from falling." Long determined that Defendant's performance indicated he was impaired.

Continuing his evaluation, Long instructed Defendant on the one-leg stand test, telling Defendant to keep his arms at his side and stand on one leg, bring his other leg up about six inches from the floor, point his toe, look at his foot, and count "one thousand one, one thousand two, one thousand three, and so on until [he] told him to stop." Defendant "swayed while he was balancing, and he used his arms again to keep from falling over." Based upon these observations, Long believed that Defendant was impaired.

Long then interviewed Defendant and asked a series of standardized questions, including what time it was. Defendant responded it was around ten o'clock. It was actually after midnight. When Long asked Defendant if he had been drinking, Defendant denied drinking or being under the influence of alcohol. Defendant further denied using marijuana or taking any prescription medications. Defendant consented to Long's request that he submit to a breath test, and Defendant's breath sample registered 0.00 percent blood alcohol content. Long believed Defendant was unable to safely operate a motor vehicle because he was under the influence of a substance other than alcohol. Long next requested that Defendant consent to a drug recognition evaluation.

A drug recognition evaluation is designed to allow an officer to detect what category of controlled substances may have rendered an individual impaired or

intoxicated and is based upon observations of certain characteristics which are known to be exhibited by an individual who is under the influence of a specific category of controlled substances. The evaluation looks for indicators of seven drug categories—central nervous system depressants, central nervous system stimulants, anesthetic dissociatives, narcotic analgesics, inhalants, cannabis, and hallucinogens—and consists of twelve standardized steps: (1) administer a breath alcohol test; (2) interview the arresting officer; (3) conduct a preliminary examination of the individual to rule out alcohol or medical impairments; (4) administer an HGN test; (5) administer the Romberg balance, walk-and-turn, one-leg stand, and finger-to-nose tests; (6) take the individual's vital signs, including pulse, blood pressure, and temperature; (7) examine the individual's eyes with a penlight in a dark room; (8) examine the inside of the individual's nose and mouth; (9) examine the individual's muscle tone; (10) interview the individual; (11) form an opinion regarding whether the individual is under the influence of a particular category of controlled substances; and (12) request a urine sample for toxicological analysis.

Deputy Shane Gooden conducted Defendant's drug recognition evaluation. Gooden was originally certified as a drug recognition evaluator in 2001. In order to receive that certification, Gooden completed a sixteen-hour pre-school program; a fifty-six-hour school program; and conducted a minimum of twelve drug recognition evaluations with a minimum accuracy rate of seventy-five percent. Gooden has been recertified as a drug recognition evaluator every two years since his initial certification and has also served as a drug recognition evaluation program instructor.

After Defendant was again advised of his *Miranda* rights, Gooden proceeded to evaluate Defendant, first asking him several generalized questions about Defendant's physical condition to ensure that Defendant had no physical conditions or infirmities that would affect an evaluation. Gooden began the drug recognition evaluation by noting that Defendant had registered a 0.00 blood alcohol content on the breathalyzer (step 1); Long had already consulted with Gooden, and Gooden had been advised of Long's observations and the information Long had obtained up to that point (step 2). Gooden next conducted a preliminary physical examination of Defendant, taking Defendant's blood pressure reading, temperature, pulse, and examined Defendant's eyes. He found Defendant's eyes to be "[w]atery and bloodshot[,]" and also observed dry mouth and body tremors. Defendant's pulse was "over the general accepted range[,]" his blood pressure was "142 over 100," which Gooden testified was "outside the normal range[,]" and Defendant's body temperature was elevated at 99.2 degrees. All of these observations indicated a "possible drug influence" (step 3). Gooden then conducted both horizontal and vertical gaze nystagmus tests and checked the conjunctiva of Defendant's eyes for redness; Gooden observed that Defendant's eye movement indicated a lack of convergence in Defendant's right eye and that the "lack of smooth pursuit, nystagmus at maximum deviation, and . . . angle of onset" indicated a "[p]ossible drug influence" (step 4). During the Romberg balance test, Defendant exhibited eyelid tremors and a slight circular sway with his head, and he estimated the passage of 30 seconds after only 21 seconds. These observations indicated to Gooden that Defendant's "[i]nternal clock [was] sped up" and eliminated the possibility that Defendant was under the influence of a central nervous system depressant. Defendant began the walk-and-turn test three times but completed it only once, during which he

"raised his arms a couple times, ... missed touching heel to toe a couple times, ... did an incorrect turn, and ... did the test rapidly and rigidly." Defendant swayed, used his arms for balance, and hopped during the one-leg stand test. During the finger-to-nose test, Gooden "observed hand and eyelid tremors" but noted that Defendant did touch in the general area of the tip of his nose. Defendant's collective performance on all of the tests indicated a "[p]ossible drug influence" (step 5). Next, Gooden took Defendant's vital signs again, and all three—pulse, blood pressure, and temperature—were still above the normal range, which indicated to Gooden a "[p]ossible drug influence" (step 6). Gooden then conducted a "darkroom examination" to check Defendant's pupils' reaction to light. Defendant exhibited "a slow reaction to light, and he had a 7.5 millimeter pupil," which Gooden interpreted as an indication of possible drug influence (step 7). Gooden also examined Defendant's nose and mouth to check for any indications that Gooden had ingested drugs orally or nasally, specifically looking for deterioration of the septum, the presence of film in his nose or mouth, or heat bumps on his tongue. Gooden detected heat bumps on Defendant's tongue (step 8). Next, Gooden checked Defendant's muscle tone and looked for injection sites on his arms, observing Defendant's rigid muscle tone and what Gooden believed to be one fresh needle mark on Defendant's right arm, both interpreted by Gooden as signs of possible drug influence (step 9). For a third time, Gooden checked Defendant's pulse rate, which was still elevated above the normal range, and then interviewed Defendant (step 10). When asked what drugs he had been using, Defendant told Gooden he had ingested one gram of cocaine and one Seroquel "three days ago." After informing Defendant of Missouri's implied consent law, Gooden requested that Defendant submit to a chemical test of his urine (step 12). Defendant responded, "Fuck you, I'm not giving you anything." He then told Gooden that he would test positive for cocaine. Based upon Gooden's findings during the drug recognition evaluation, Gooden believed that Appellant was under the influence of a central nervous system stimulant and was unable to safely operate a motor vehicle (step 11).

At trial, Gooden testified over Defendant's objection that it was his opinion, based on the drug recognition evaluation, that Defendant had been under the influence of a central nervous stimulant and unable to safely operate a motor vehicle at the time of his arrest. Gooden also testified as to the results of each step of the drug recognition evaluation, including Defendant's statements that he had ingested cocaine three days prior to the underlying incident and that he would have tested positive for cocaine had he submitted to the requested urine test. Gooden stated that he would expect a person under the influence of cocaine to exhibit rapid, aggressive driving, which Gooden believed was consistent with Defendant's driving as observed during a replay of a video of the pursuit.

The jury found Defendant guilty on all four counts. In his motion for new trial, Defendant claimed that the trial court erred in overruling Defendant's objection to Gooden's opinion that Defendant was under the influence of a central nervous system stimulant following a drug recognition evaluation under the scientific standards applicable in *Frye*.[2] Defendant's motion was denied, and he was sentenced to seven years' imprisonment for driving

---

**2.** *Frye v. United States,* 293 F. 1013 (D.C.Cir. 1923).

while revoked, which the trial court ordered to be served concurrent with a ten-year sentence for assault of a law enforcement officer, a seven-year sentence for resisting arrest, and a ten-year sentence for driving while intoxicated. Pursuant to a special order from this Court, Defendant was permitted to file a late notice of appeal.

### Standard of Review

In general, "[a] trial court has broad discretion to admit or exclude evidence at trial." *State v. Madorie*, 156 S.W.3d 351, 355 (Mo. banc 2005). This holds true for expert testimony. *State v. Tyra*, 153 S.W.3d 341, 348 (Mo.App.2005). "This standard of review compels the reversal of a trial court's ruling on the admission of evidence only if the court has clearly abused its discretion." *Madorie*, 156 S.W.3d at 355. "That discretion is abused when a ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." *State v. Gonzales*, 153 S.W.3d 311, 312 (Mo. banc 2005). Moreover, "this Court reviews rulings involving the admission of evidence for prejudice, rather than mere error." *State v. Placke*, 290 S.W.3d 145, 153 (Mo.App.2009). Thus, reversal is required only if the error was outcome determinative. *Id.* In examining the record on appeal, we make no credibility determinations and accept as true all evidence and inferences favorable to the verdict while disregarding all evidence and inferences to the contrary. *Hall*, 201 S.W.3d at 603.

### Discussion

Defendant presents one point relied on in his appeal, which we set forth below:

> The trial court erred and abused its discretion when it permitted Detective Gooden to testify over [Defendant's] foundation objection that it was Gooden's opinion, based on a drug recognition evaluation, that [Defendant] was under the influence of a central nervous system stimulant at the time he was driving, in violation of [Defendant's] rights to due process of law and a fair trial as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Sections 10 and 18(a) of the Missouri Constitution. The State failed to demonstrate that the ability to determine intoxication from a specific drug category from a drug recognition evaluation without a toxicology examination was generally accepted in the scientific community, a necessary foundation for expert testimony.

We need not decide whether the trial court abused its discretion as Defendant contends because our determination that Defendant cannot show prejudice by the admission of Gooden's challenged opinion testimony is dispositive.

Assuming, without deciding, that the trial court abused its discretion in admitting Gooden's opinion testimony, Defendant cannot succeed in his argument because he has not and cannot show the requisite outcome-determinative prejudice resulting from such admission. In order for error to be prejudicial and thus require reversal, it must be shown that, but for the admission of the challenged evidence, there is a reasonable probability that the result would have been different. *State v. Barriner*, 210 S.W.3d 285, 304 (Mo.App. 2006). As our Supreme Court has stated:

> Errors in admitting evidence require reversal only when prejudicial to the point that they are outcome-determinative. *State v. Black*, 50 S.W.3d 778, 786 (Mo. banc 2001). "A finding of outcome-determinative prejudice expresses a judicial conclusion that the erroneously ad-

mitted evidence so influenced the jury that, when considered with and balanced against all evidence properly admitted, there is a reasonable probability that the jury would have acquitted but for the erroneously admitted evidence." *Id.* *State v. Johnson*, 207 S.W.3d 24, 42 (Mo. banc 2006). Thus, Defendant must show that "there is a reasonable probability that the jury would have acquitted but for" Gooden's challenged opinion testimony. Defendant has failed to make such a showing.

Defendant only challenges Gooden's opinion testimony that Defendant was under the influence of a central nervous system stimulant, or step 11 of the drug recognition evaluation. Our review is limited to those issues raised in an appellant's point relied on and subsequently expounded upon in an appellant's argument. *See* Rule 84.04(e) as made applicable by Rule 30.06(c); *State v. Morrow*, 541 S.W.2d 738, 740 (Mo.App.1976). Consequently, the remainder of Gooden's testimony, including his observations during all of the other steps of the drug recognition evaluation, may be considered by this Court as unchallenged and properly before the jury. On that basis, it is impossible to conceive that a reasonable probability exists that but for Gooden's statement that he believed Defendant to have been under the influence of a central nervous system stimulant, the jury would have acquitted Defendant of driving while intoxicated.

 Pursuant to section 577.010.1, "a person commits … driving while intoxicated if he operates a motor vehicle while in a drugged condition." *State v. Friend*, 943 S.W.2d 800, 801 (Mo.App.1997). The term "drugged condition" has been equated with "intoxicated condition," *State v. Hoy*, 219 S.W.3d 796, 802 (Mo.App.2007), which "is a 'physical condition' usually evidenced by unsteadiness on the feet, slur-

ring of speech, lack of body coordination and an impairment of motor reflexes[,]" which may be established by any witness who had a reasonable opportunity to observe the defendant's physical condition. *Hall*, 201 S.W.3d at 603 (quoting *State v. Teaster*, 962 S.W.2d 429, 431 (Mo.App. 1998)). "[T]he proof necessary to establish driving under the influence of drugs [is] no different than that to make a case for driving under the influence of alcohol." *Hall*, 201 S.W.3d at 603 (citing *State v. Meanor*, 863 S.W.2d 884, 888 (Mo. banc 1993)). Thus, "when there is evidence that a person has recently consumed alcohol and/or drugs and is then observed showing signs of impaired judgment and motor skills consistent with the use of such drugs or alcohol, it can be concluded that the drugs and/or alcohol have caused such impairment." *Friend*, 943 S.W.2d at 802.

Excluding Gooden's challenged opinion that Defendant was under the influence of a central nervous system stimulant, there was abundant evidence demonstrating both the presence of a drug in Defendant's body and Defendant's impaired driving ability due to that drug. *See Hoy*, 219 S.W.3d at 802 ("intoxicated condition" element of the offense of driving while intoxicated under § 577.010.1 is composed of three components: (1) *impaired ability*— the defendant's impaired ability in any manner to operate a motor vehicle at the time of the alleged offense; (2) *presence of the substance*—the presence of the proscribed substance in the defendant's body at the time of the alleged offense; and (3) *causation*—the causal connection between the presence of the proscribed substance and the impaired ability to operate a motor vehicle).

As to the presence of a drug, Long testified that Defendant's eyes "jerked" and "bounced" during the initial HGN, that Defendant swayed back and forth and

was unable to stand still during the HGN, and that nystagmus was present in both eyes; that Defendant failed the walk-and-turn test, as he began before instructed to do so, used his arms for balance, took too many steps, and "had to stop and steady himself from falling"; that Defendant failed the one-leg stand test, as he swayed while attempting to balance and "used his arms again to keep from falling over"; that Defendant was unaware of the time; that the results of Defendant's breath test showed no blood alcohol content; and that Defendant denied drinking, using marijuana, or taking any prescription medications or that he had any physical issues with his legs that would hinder walking, standing or operating a vehicle. Long also stated that Defendant was sweating profusely and did not know what was going on, telling the arresting officers that he thought he had been in a fight.

Gooden testified that Defendant's eyes were "[w]atery and bloodshot," Defendant showed no signs of a medical impairment, and Defendant had dry mouth and body tremors. He also testified that Defendant's pulse rate, blood pressure, and body temperature were all above the normal ranges throughout the duration of his examination of Defendant. Gooden stated that Defendant again failed the HGN and other nystagmus tests; that Defendant's internal clock was accelerated; that Defendant exhibited eyelid tremors and swaying during the Romberg balance test; that Defendant again failed the walk-and-turn test, as he started the test three times, used his arms for balance, missed touching heel to toe several times, turned incorrectly, and "did the test rapidly and rigidly"; that Defendant again failed the one-leg stand test, as he hopped, swayed, and used his arms for balance; that Defendant exhibited "hand and eyelid tremors" during the finger-to-nose test; that Defendant's pupils exhibited a slow reaction to light;

that Defendant had heat bumps on his tongue, a result of smoking cocaine or methamphetamine; and that Defendant's muscle tone was rigid. Gooden testified that Defendant denied having any medical condition or illness that would impair his ability to undergo the drug recognition evaluation as well as having used any alcohol or prescription drug, effectively excluding any other reason for Defendant's symptoms and behavior. Gooden then testified that Defendant told him, in response to Gooden's request for a urine sample, that he would test positive for cocaine and that Defendant had a fresh needle mark on his right arm.

As evidence of Defendant's impaired driving ability, numerous officers involved in the chase testified as to the erratic and dangerous driving exhibited by Defendant during the ordeal, including that Defendant abruptly cut off a pickup truck by turning right from the passing lane, causing the truck to go into a ditch; that Defendant ran multiple stop signs while repeatedly driving at "excessive" speeds; that Defendant drove through a ditch to avoid a stalled vehicle while driving approximately 70 miles per hour; that Defendant swerved between lanes unpredictably; that Defendant turned into traffic at a busy intersection, missing one semi-truck by a few inches and another truck by a few feet; that Defendant drove through a median to avoid driving over spike strips, coming within a few feet of a law enforcement officer, and continued on to drive southward in the northbound lanes at approximately 90 miles per hour, turning off his headlights even though it was 10:30 at night; that Defendant continued driving after three of his tires had shredded off the wheels after having been punctured by spike strips, again driving into the median to avoid capture and becoming stuck in the process; and that Defendant repeatedly

attempted to jump out of his moving vehicle. Moreover, the videotape of these events from the camera inside Long's car was played for the jury.

 The evidence that Defendant's impaired driving ability was due to the presence of the drug in Defendant's body included circumstantial evidence that Defendant denied any prescription drug, alcohol, or marijuana use and denied any physical impairment to his legs that would affect his driving. In addition, direct evidence was presented by Long's testimony, without objection, of his lay opinion that Defendant "was under the influence of something other than alcohol" and that Defendant was not able to safely operate a vehicle. Intoxication may be proved by a lay witness who has had a reasonable opportunity to observe the alleged offender. *Hoy*, 219 S.W.3d at 807; *State v. Meanor*, 863 S.W.2d 884, 888 (Mo. banc 1993).

Where there is strong evidence of the defendant's guilt, other than the witness's challenged testimony, no prejudice results to the defendant as a result of admitting that testimony. *State v. Kidd*, 990 S.W.2d 175, 181 (Mo.App.1999). Here, the remainder of the evidence against Defendant—particularly Defendant's admission to Gooden that his urine would test positive for cocaine, coupled with the fresh needle mark on his arm; the videotape of the 41–mile, 42–minute pursuit; and Long's opinion that Defendant was under the influence of a substance that impaired his ability to drive, along with Defendant's admitted absence of any other reason for such impaired driving—leave no reasonable probability that Defendant would have been acquitted but for the admission of Gooden's opinion that Defendant was under the influence of a central nervous system stimulant. Therefore, that opinion

was not outcome determinative. Defendant's point is denied.

### *Decision*

The trial court's judgment is affirmed.

BARNEY, P.J., and BURRELL, J., concur.